CALIFORNIA IRON YARDS CO., E. D. KEEFFE, TRUSTEE, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 11841, 17309. Promulgated January 24, 1929.

*Robert A. Littleton, Esq., W. W. Spalding, Esq.,* and *M. Serf, C. P. A.,* for the petitioner.

*John D. Foley, Esq.,* for the respondent.

28

OPINION.

TRAMMELL: The petitioner presented no testimony or arguments respecting issues 3, 4, and 5, except in relation to depreciation, which is also covered by issue No. 7. Therefore, the determination of the respondent in respect to those issues is sustained for lack of proof.

The petitioner pleads the statute of limitations for all years involved. Five consents in writing were introduced in evidence at the hearing. Three of these were in the name of the California Iron Yards Corporation and did not purport to be the consents of the petitioner corporation. They were signed by E. D. Keeffe as president of the California Iron Yards Corporation. While Keeffe was a director of the petitioner corporation, he did not purport to sign the consents by or in behalf of the petitioner but as president of the California Iron Yards Corporation, a new corporation. Obviously these consents have no effect to extend the period of limitation in so far as the petitioner is concerned. *Bamberg Cotton Mills Co.*, 8 B. T. A. 1236. These three consents, signed in the name of the California Iron Yards Corporation, may therefore be disregarded in consideration of this case.

The next question is whether the consent executed February 15, 1923, for the fiscal year ending January 31, 1918, which purported to consent to a determination, assessment and collection of the income and profits taxes due for the fiscal year ended January 31, 1918, irrespective of any period of limitation, is effective to bind the petitioner corporation, and if so, for what period of time. Second, whether the consent dated January 16, 1925, in the name of the California Iron Yards Co., the petitioner, and signed by E. D. Keeffe, "taxpayer president by Andrew Steed Secretary," is sufficient in law to have the effect of extending the period for the assessment and collection of the taxes for the fiscal years 1918 and 1919.

The petitioner has acted upon the theory that the petitioner corporation was a dissolved corporation under the laws of California and the petition was filed by the surviving directors as trustees. It is claimed that the charter of the corporation was forfeited by operation of law at 6 o'clock p. m., on March 5, 1921, for failure to pay the required license tax to the State of California. The fact is, however, that the charter was not forfeited, but merely the corporate rights, privileges and powers were suspended. The Supreme Court of California, in the case of *Ransome-Crummey Co.* v. *Superior Court*, 205 Pac. 446, had occasion to interpret the meaning and effect of the specific statutory provisions under which the powers of this corporation were suspended. This statute was enacted in 1917 and provides as follows:

Section 3669c, subdivision 2, of the Political Code, reads:

After six o'clock p. m. of the Saturday preceding the first Monday in March of any year, the corporate rights, privileges and powers of every domestic corporation which has failed to pay said (franchise or other) tax and money penalty shall, from and after said hour of said day, be suspended, and incapable of being exercised for any purpose or in any manner, except to defend any action brought in any court against such corporation, until said tax with all accrued penalties * * * are paid as hereinafter provided.

The court in interpreting this section said:

Before the enactment of these statutes, the penalty imposed upon a corporation for a failure to pay its license and franchise taxes was a forfeiture of its charter (Stats. 1905, p. 493, and amendments thereto; Stats. 1911, p. 530; Stats. 1915, p. 422), which resulted in a dissolution of the corporation. * * * After such a forfeiture the corporation was governed by the rules relating to dissolved corporations, and all actions prosecuted by or against such a corporation abated, except in those cases where an action against the corporation survived by the terms of section 10 a of the Act of 1905 as added by St. 1906 (Ex. Sess.) p. 25, as amended * * *. Under the terms of the present statutes, the penalty for nonpayment of license and franchise taxes has been changed, and the result of such nonpayment is no longer a forfeiture of its character and consequent dissolution of the corporation, but only a suspension of its rights, powers, and privileges, with a provision for revival. * * *

It follows that petitioner did not cease to exist during the period of suspended animation. Its right, therefore, to maintain the action against Graves is not governed by the rules relating to dissolved corporations, and the question of the power of its directors to maintain the action in the corporate name is not involved. During the time its taxes were unpaid, petitioner was shorn of all rights save those expressly reserved by the statutes. The right to institute or maintain actions is not included in this reservation, but is denied to corporations as a part of the penalty.

In view of the law of California as interpreted by the Supreme Court of that State, we think the petitioner was in error in following the procedure prescribed in the case of dissolved corporations. The fact is that the corporation was not dissolved. The respondent has raised no question, however, as to the right of the petitioner to maintain this proceeding by and through Keeffe as sole surviving director of the petitioner corporation. This fact, however, does not obviate the necessity of the Board determining whether it has jurisdiction when the facts are presented on the face of the record. We think that the petitioner's officers or directors of the corporation might properly defend the corporation in any proceeding brought against it. While under the statutes of California the corporation, itself, has no power to *institute* proceedings, this proceeding before the Board, while initiated by a taxpayer, is in its nature in substance a defensive action.

The Commissioner proposes to assess a tax, and unless reason is shown why it should not be assessed, it will be assessed and collected under the statute. It is an action to prevent the collection of the tax rather than an action to recover something in behalf of the corporation. The penalty provisions of the statute were calculated to penalize the corporation and not to penalize its creditors or to penalize the Government or prohibit it from collecting taxes which might be due by proper proceedings. Nor, in our opinion, was the purpose of the statute to prohibit the corporation at any time from defending itself and having its liability judicially determined, although its power to institute and maintain actions generally is suspended. Otherwise, a corporation in California whose powers were suspended under the statute here involved, would never, at any time, have its day in court, either before or after it is required to pay the tax.

In view of the foregoing, it is our opinion that the corporation had the power to institute this proceeding. The statute provides that when a notice of deficiency is mailed according to law the taxpayer shall have the right to file the petition with the Board. When the amended petition was filed and at the time of hearing, Keeffe was the sole surviving director. The corporation had no power to elect other officers to take the places of its officers who had died while its rights and privileges as a corporation were suspended,

and the proceeding being instituted in the name of the corporation, the taxpayer, by its only surviving director and officer, it is our opinion that the proceeding was properly instituted, although Keeffe was erroneously designated as a trustee. He was not in fact a trustee.

The next question is whether the consent which was signed in the name of the corporation February 15, 1923, by the California Iron Yards Co., by William H. McDaniel, president, and by the Commissioner, is sufficient to extend the period wherein any tax due for the fiscal year ended January 31, 1918, may be determined, assessed and collected, irrespective of any period of limitations as provided in the written consent. Second, whether the consent dated January 16, 1925, which provides that the California Iron Yards Co., the petitioner, and the Commissioner of Internal Revenue waived the time prescribed by law for making any assessment of the amount of income and profits tax due under any return made by or on behalf of the taxpayer for the years 1918 and 1919, which consent was signed by E. D. Keeffe, "taxpayer president by Andrew Steed, Secretary," and the Commissioner of Internal Revenue, is valid and binds the corporation.

With respect to the first waiver above referred to, which was signed by the taxpayer corporation by its president, we think that it is clearly sufficient to extend the period of limitations. It provided in its terms no definite period of extension, but was to permit the determination, assessment and collection of the taxes due irrespective of any period of limitation. Since no period of limitation was provided, in our opinion, this consent was valid and extended the period for a reasonable length of time. What is a reasonable length of time is to be determined by all the facts and circumstances in the case.

The Revenue Act here involved permits a taxpayer and the Commissioner to extend the period of limitations prescribed in the statute. The taxpayer, through its president last elected and who held office when the powers of the corporation became suspended, acted in behalf of the corporation and signed the corporation's name by himself as president to this consent. In our opinion the corporation is bound by the consent so signed.

While the consent dated January 16, 1925, was not signed by the corporation itself, it purported to be in behalf of the corporation and was signed by E. D. Keeffe. At the time when this consent was signed by Keeffe he was one of two surviving directors of the taxpayer corporation.

Corporations may act by its directors and the action of directors may be binding upon the corporation to the same extent as acts performed by officers. We may assume in the absence of any evidence to the contrary, that Keeffe acted with the full knowledge and con-

sent of the other director and officer of the suspended corporation and in the absence of any showing that Keeffe as a director was not acting within his authority, we think that this consent is sufficient to bind the corporation. *Premier Packing Co.*, 12 B. T. A. 637.

The consent which was signed on February 15, 1923, with respect to the fiscal year 1918, was sufficient to extend the period of limitations until the consent which was subsequently signed by E. D. Keeffe, the consent of the taxpayer corporation on January 16, 1925, was executed. It is contended by the petitioner that the later consent was not valid because it bore the seal of the California Iron Yards Corporation and not the taxpayer corporation, but in our opinion, the absence of a proper seal is not sufficient to vitiate the consent. It was not purported to be by and on behalf of the California Iron Yards Corporation but was in the name of and purported to be by and on behalf of the California Iron Yards Co., the petitioner corporation. Nor do we think that it is material that Keeffe placed after his name the word " president " when he was not in fact president of the taxpayer corporation but was president of the California Iron Yards Corporation, the successor corporation. The designation of his office was merely descriptive of the person. He was also one of the duly elected directors of the taxpayer corporation.

With respect to the fiscal year ended January 31, 1920, it appears that the tax was assessed after the passage of the Revenue Act of 1924 and within the five-year period prescribed by the statute. The statute, therefore, has not run upon the collection of the deficiency for 1920.

With respect to the merits of the case, the petitioner claims a deduction on account of amortization of war facilities. We have set out in our findings of fact the facts relating to this issue. It appears, however, that the petitioner corporation has never at any time prior to the filing of the petition in this proceeding filed a claim for amortization. A claim was filed in November, 1924, by the California Iron Yards Corporation, which was not the petitioner in this case. Section 1209 of the Revenue Act of 1926 provides that the deduction provided for by paragraph 8 of subdivision (a) of section 234 of the Revenue Act of 1918 may (notwithstanding any provisions of the Revenue Act of 1921) be allowed for the taxable years 1918, 1919 and 1920 *if claim therefor was made before June 15, 1924.* No claim was filed prior to June 15, 1924, and in our opinion the taxpayer is not entitled to any amortization allowance. *Shipowners & Merchants Tugboat Co.*, 4 B. T. A. 403. It is not necessary, therefore, for us to discuss the facts or to determine whether the facts would entitle the petitioner to an allowance if a proper claim had been filed.

Petitioner claims that, if it is not entitled to amortization, it is entitled to a deduction on account of depletion, wear and tear and obsolescence of plant and equipment in amounts substantially greater than those allowed by the respondent. The only testimony introduced as to the life of the assets and the depreciation sustained was of a very general nature. It consisted of testimony that machinery left out in the open and unprotected by housing in that locality in which the petitioner's plant was located would have an average life of five years if left idle and not operated or kept up by repairs. The principal witness, a lawyer by profession, on this question does not appear to have seen the assets until 1923. During the years 1918 and 1919, however, petitioner's machinery and equipment were operated at full capacity. The petitioner was on a fiscal year basis ending January 31. Only one month of the fiscal year 1920 was in the calendar year 1920.

There was testimony that during the year 1920 a great part of the machinery was idle and a considerable part of it exposed to the weather, but there is no evidence that, during any portion of the fiscal years involved here, such was the case. The fiscal year 1921, which comprised all the calendar year 1920 except January, is not before us. The testimony as to the five-year life on idle equipment does not apply. It has further been shown that four shears purchased in 1917 or 1918 were sold in October, 1925, by the successor corporation, seven or eight years later, for $2,000 which indicated clearly that at that time they were not fully depreciated as they would have been if they had had a life of 5 years according to the testimony. It is also shown that two magnets purchased in 1918 were sold seven years later by the successor corporation, and the Gantry crane purchased in 1918 was sold by the successor in 1925 for $1,750. These three classes of machines represented a substantial part of the petitioner's equipment, and each had a life in excess of seven years although they had become idle in 1920. The locomotive crane, one magnet, one set of shears, and the electrical equipment were still in use at the time of this hearing, as were also some of the buildings and part of the trackage. This evidence does not convince us that petitioner is entitled to a deduction on account of the exhaustion, wear, tear and obsolescence during the years involved in this proceeding at the rate it claims, or in any greater amount than that determined by the respondent.

Petitioner purchased an acetylene generator in February, 1919, at a cost of $500. After installing the generator and underground piping connected therewith, it found that it was unsuited for its purposes, since sufficient gas pressure could not be obtained. The generator was therefore not used at any time. The petitioner has

failed to show that there was no market for the generator or that it could not have been sold, nor is there sufficient evidence to warrant us in holding that it was abandoned—merely removing it is not abandonment. It is apparent that it was not obsolete, as it was new, but was merely unsuited to the taxpayer's business. The action of the Commissioner in failing to allow the deduction must be approved. See *Flexible File Co.*, 13 B. T. A. 909.

The petitioner claims that it is entitled to assessment under sections 327 and 328 of the Revenue Act of 1918 on account of abnormalities affecting its business during the fiscal years ending January 31, 1919, and January 31, 1920. After a consideration of all the evidence and facts submitted, we are unable to find that any abnormalities existed in respect to capital or income as contemplated in section 327 of the Revenue Act of 1918. The mere fact that large earnings were made during the years 1918 and 1919 is insufficient to constitute a basis for special assessment. See *Alberts, Inc.*, 10 B. T. A. 1132; *Penn Chemical Works*, 7 B. T. A. 442. Nor under the facts in this case does the fact that the petitioner neglected to file a claim for amortization bring it within the purview of that section. There is not sufficient evidence before us to enable us to determine the amount of the deduction, if any, the petitioner has been prevented from having the benefit of, by such failure, even if it be held that such neglect constitutes an abnormality.

The action of the Commissioner, therefore, in refusing to assess the taxes under the provisions of the articles of sections 327 and 328 of the Revenue Act of 1918 is approved.

Reviewed by the Board.

*Judgment will be entered for the respondent.*

LITTLETON, STERNHAGEN, MORRIS, GREEN, and MURDOCK dissent.