ST. LOUIS MALLEABLE CASTING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 5490, 15168.   Promulgated November 15, 1927.

*R. M. O'Hara, Esq.*, *N. B. Landreau, Esq.*, and *Beach P. Burlingham, Esq.*, for the petitioner.

*L. L. Hight, Esq.*, and *Granville S. Borden, Esq.*, for the respondent.

OPINION.

LITTLETON: The first issue is the value at March 1, 1913, of the patterns owned by the petitioner on that date. As set forth in the findings of fact, a value has been assigned to these patterns at March 1, 1913, in the report of the appraisal company which purported to be the reconstruction cost of the patterns then on hand, less its estimate of depreciation sustained prior to that date.

The so-called retrospective appraisal of patterns was at best a rough segregation of the working hours and material applicable to patterns as shown by the petitioner's records into working hours and material applicable to patterns owned by the petitioner and those owned by customers. This was done on a percentage basis by calculating the cost of all pattern labor and materials, adding 60 per cent overhead and 20 per cent profit, and comparing this total amount with the amount actually charged on the books to customers. In order for this calculation to be correct all patterns must be of equal size and weight and of equal ease of manufacture, which, of course, was not a fact.

The appraiser did not take each pattern and determine the reconstruction cost thereof nor did he eliminate obsolete, discarded or worthless patterns, nor did he check over the patterns to ascertain if all of the patterns which were made by the petitioner from 1903 to March 1, 1913, were still in existence. If a large part of the labor and materials on the books of the petitioner had been extravagantly or wastefully spent or wholly wasted, the appraisal would not eliminate such waste, but would magnify the amount by applying increased costs thereto.

Therefore the figures set forth in the appraisal applicable to patterns do not represent an appraisal of patterns but an appreciation of book costs and are therefore of little value in arriving at the fair market value of the petitioner's patterns at March 1, 1913.

The only additional evidence contained in the record as to the value of these patterns was an expression of opinion by Martin B. Hammell, who is secretary and treasurer of the petitioner company. He testified that in his opinion the patterns of the petitioner were worth at least the amount shown in the appraisal company's report. However, it was not shown that Mr. Hammell had ever examined all of the patterns owned by the petitioner, nor had he any personal knowledge of the cost of constructing patterns other than a general knowledge from examining the accounts of the company. We do not feel that Mr. Hammell had a sufficiently intimate knowledge of the patterns owned by the petitioner and the cost or market value thereof at March 1, 1913, to make more than an unsupported guess as to the value. Furthermore, since the petitioner is claiming a value for patents based upon the net profits derived from the manufacture and sale of patented articles, any value in excess of cost of the patterns would be reflected in the value of patents thus determined. In computing the overhead expenses used in determining the cost of producing patented articles, it is not apparent that the petitioner increased the pattern value over cost as shown by the books. From a consideration of all the evidence submitted we approve the Commissioner's determination of the March 1, 1913, value of patterns for the purpose of depreciation deduction.

The next issue is the value of patents owned by the petitioner on March 1, 1913. The average profits ascribed to the various patents by an analysis of the petitioner's records for the years 1911 and 1912 and the remaining life as at March 1, 1913, are as follows:

| Patent number | Average profit, 1911 and 1912 | Remaining life after Mar. 1, 1913 |
| --- | --- | --- |
| | | Years |
| 905414 | $194.71 | 12¾ |
| 906003 | 25,417.17 | 12¾ |
| 906787 | 37.82 | 12¾ |
| 908082 | 139.51 | 12⅚ |
| 919840 | 1,105.50 | 13 1/12 |
| 995123 | 316.75 | 14½ |

From a consideration of all the evidence, we are of opinion that the fair market value of these patents on March 1, 1913, was as follows:

| Patent No. | March 1, 1913, value |
|---|---|
| 905414 | $6,073.78 |
| 906003 | 79,285.46 |
| 906787 | 117.99 |
| 908082 | 438.03 |
| 919840 | 3,349.03 |
| 995123 | 1,020.65 |
| Total | $90,284.94 |

These amounts represent the fair market value of petitioner's patents at March 1, 1913, and the amount to which the petitioner is entitled as a deduction for each patent in the years in question is an aliquot part of such value equal to the patent value divided by the years of life remaining after March 1, 1913.

The petitioner alleges error on the part of the Commissioner in computing depreciation for the years 1917 and 1918, by eliminating from the asset account, used as a basis for depreciation, certain amounts representing items of equipment claimed to be wholly depreciated. For example, the total cost of all items of the machinery and fixtures account up to December 31, 1916, as shown by the books of the petitioner, was $97,052.67. The revenue agent, whose action upon this issue was followed by the Commissioner, reduced this cost to $43,088.38. The difference is due to the elimination of the earliest purchases which, on the basis of the rates of depreciation used, would be entirely depreciated by December 31, 1916. The petitioner asks that depreciation for 1917 and 1918 be based upon a cost at December 31, 1916, of $97,152.67 instead of the $43,088.38 used by the Commissioner. No objection is raised by the petitioner to the rates used by the Commissioner for the prior years, nor is evidence presented to show that repairs or maintenance increased the life of the assets beyond the years indicated by the rates used.

The application of the method proposed by the petitioner would produce results which are inconsistent with the theory of a depreciation charge. Obviously, unless there is error on the part of the Commissioner in the rates of depreciation used, the assets which were fully depreciated at the end of their expected life should not remain in the asset account and be depreciated over years when they are no longer in existence. To do so would be to permit a double recovery of the same assets. Accordingly, on the basis of the evidence presented, we must sustain the action of the Commissioner in computing the depreciation allowance only on assets which his determination showed had not yet been fully depreciated.

The next contention of the petitioner is that the Commissioner, in computing the depreciation for 1920 and 1921, used as a basis the net amounts appearing in the petitioner's balance sheet for Decem-

ber 31, 1916, instead of the total cost of the assets, and also used inadequate rates of depreciation.

An examination of the revenue agents' reports which were followed by the Commissioner shows that in the report for 1917, 1918, and 1919 depreciation was computed on the basis of the total cost of the assets, whereas in the report for 1920 and 1921 depreciation was computed on the balances of the assets as shown by petitioner's books, which balances represented the total costs less the various depreciation charges which the petitioner had made against the assets. In both reports the same rates of depreciation were used, except in the case of office furniture and fixtures where the report for the later years used a lower rate. Under the previous issue we sustained the action of the Commissioner with respect to the basis of depreciation for 1917 and 1918, which action was based on the revenue agent's report for these years and which provided for depreciation on the total cost of the assets, less proper eliminations for fully depreciated assets. We are of the opinion that the same method should be applied for 1920.

An examination of the petitioner's record shows that it did not employ a consistent method of computing depreciation prior to 1917. It took no depreciation whatever prior to 1912, in which year it deducted some $40,000. In 1914 and 1915 no depreciation was written off except on patterns and on machinery and fixtures. The record further shows that on an investment of $39,305.24 for furnaces and ovens up to 1916, only $3,000 was written off as depreciation. In respect to these assets the petitioner introduced testimony to the effect that the proper annual rate of depreciation was 7½ per cent and that the two furnaces purchased in 1903 and a third purchased in 1907 became entirely worthless in 1920. In view of this testimony, it is evident that the asset value of furnaces and ovens, on the books at December 31, 1916, was erroneous and would result in having a large balance still remaining on the books in 1920 when the assets were entirely depreciated. The same appears to be true of other depreciable assets. For example, in the case of patterns, testimony was introduced as to their useful life, including an allowance both for wear and tear and also for obsolescence which agrees with the rates used by the Commissioner. It further appears that no objection is raised to the rates of depreciation used prior to December 31, 1916, the controversy being over the resultant effect of the application of the rates.

In view of the foregoing, the Board is of the opinion that not only should the respective rates of depreciation be applied to total costs of assets, after proper adjustment for assets fully depreciated, for the purpose of determining a reasonable allowance for depreciation in

the various years, but also surplus should be adjusted in conformity therewith for all years on appeal.

The application of the foregoing principle also disposes of the issue raised as to $10,025.52 written off in 1917 on account of obsolete patterns, since the 10 per cent depreciation rate on this class of assets includes an allowance for obsolescence. The foregoing amount was disallowed as a deduction by the Commissioner for 1917 and restored to the asset account for depreciation and invested capital purposes for 1917 and 1918, but the evidence shows that this adjustment was not carried through into 1920, and we are, accordingly, of the opinion that the determination in 1920 with respect to this item should be consistent with the action for 1917 and 1918.

We are also satisfied that the depreciation rate of 10 per cent on office furniture and fixtures which was used by the respondent in the determination of the deficiencies for 1917 and 1918 should likewise be applied in 1920.

During the year 1918 an amount of $9,879.93 was spent for heating units, consisting of square boxes about 10 feet by 8 feet, containing motors and fans. This item was added to building account by the revenue agent, but should properly have been added to machinery and fixtures account. Therefore, this amount should be excluded from the building account and added to machinery and fixtures account.

The depreciation rate on ovens and furnaces has been established at 7½ per cent. Therefore, that account should be revised beginning with 1903 so as to reflect this rate. The depreciation rates applied to all assets in 1918 and prior years should also be applied in 1920.

During the years 1920 and 1921 the petitioner engaged in a new building program, expending $253,181.62 in 1920 and $108,120.48 in 1921, a total of $381,302.10. The buildings were erected in sections, and one section was completed and put in use in the early part of July, 1920. The cost of the completed section is not shown in the record and evidently was not segregated on the books. The petitioner apparently desires that a segregation be made on the basis of square feet of floor area of the completed section as compared with the total floor area. The petitioner's witness testified that the construction on the two sections was the same and that consequently the cost per square foot in each case would be the same. The total floor area of both sections was 70,715 square feet and that of the section completed in July, 1920, was 38,860 square feet.

While this manner of segregating costs is only an approximation and not generally acceptable in determinations of this character, we believe that in this instance we are justified in computing a cost on this basis. It is of general knowledge that building costs reached a peak about the middle of 1920 and thereafter declined to the close

of 1921. Consequently, with similar types of construction of the two sections, the second section would not normally have cost more per square foot than the first section, and may have cost less.

We are, therefore, of the opinion that the cost of the first section should be determined on this basis and depreciation be allowed thereon for 1920, beginning with July, 1920.

During 1920 the Commissioner disallowed as deductions for repairs various items aggregating $11,254.59, on the ground that such expenditures were capital investments, but allowed no depreciation thereon for the year 1920. The evidence shows that these expenditures were made on improvements to buildings and were put into use during 1920.

The petitioner is entitled to depreciation on these assets during 1920 for the portion of the year that they were in use as indicated in the following schedule:

| Item | Account | Amount | Date put into use |
|---|---|---|---|
| New plumbing in old buildings | Buildings | $1, 856. 84 | May 15, 1920 |
| New wall, plus salvage value of old brick used | ____do | 4, 696. 45 | Dec. 1, 1920 |
| Moving and reerecting flask shed and carpenter shop | ____do | 2, 201. 30 | Apr. 1, 1920 |
| New skylights in old buildings | ____do | 2, 500. 00 | May 1, 1920 |
| | | 11, 254. 59 | |

*Judgment will be entered on 15 days' notice, under Rule 50.*

Considered by SMITH, TRUSSELL, and LOVE.