New York City Omnibus Corporation v. Commissioner.
New York City Omnibus Corp. v. Commissioner
Docket No. 2757.
United States Tax Court
1948 Tax Ct. Memo LEXIS 24; 7 T.C.M. (CCH) 899; T.C.M. (RIA) 48254; November 30, 1948
*24 Charles C. Parlin, Esq., and Paul R. Russell, Esq., for the petitioner. Thomas H. Lewis, Jr., Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion KERN, Judge: Respondent determined deficiencies in petitioner's income tax for the years 1936 through 1939, and by amendment to his answer has sought increases, all as follows: Increases sought by
amendment to
Deficiency Notice
answer
1936
$225,263.02
$83,981.64
1937
70,949.56
65,058.29
1938
81,792.46
69,363.09
1939
95,170.36
51,836.59
At the request of the parties, one issue was severed and disposed of at a prior hearing, - the proper basis (unadjusted) to be used by petitioner in computing a reasonable allowance for depreciation of its franchise to operate omnibuses in New York City. In a memorandum opinion, entered May 23, 1946, this Court held that petitioner's basis "is the full cost of the bus franchise." The following issues still remain for disposition: 1. The cost of petitioner's bus franchise for amortization purposes, the principal item of difference arising over the value to be placed on street car franchises surrendered by its predecessor, *25 New York Railways Corporation, to the City, required as one element in petitioner's acquisition of its franchise. For the sole purpose of facilitating the presentation of evidence on this point, the parties have agreed to the use of June 10, 1936, as the valuation date; 2. The proper date for the beginning of the period for which amortization was properly allowable to petitioner, petitioner contending for the date of December 24, 1936, respondent, for February 12, 1936; 3. The rate of depreciation on petitioner's buses for each of the years 1936 to 1939, respondent having allowed a rate based upon a seven-year life for 1936 and on a nine-year life for the other years; 4. The propriety of the inclusion in petitioner's income for 1936 of earnings from bus operations for the period February 12 - December 24, 1936, aggregating $743, 729.09, which petitioner claims it was obliged to and did remit to New York Railways Corporation, pursuant to contract and the order of the Federal District Court; and, if properly includible, a consideration of the deductions and credits, if any, allowable to petitioner; 5. The allowability to petitioner of a deduction in 1936 for a so-called reserve *26 for accident and damage claims, which it was obliged to create, and the unexpended balance of which, if any, it was required to pay over to New York Railways Corporation. A decision of these issues will also decide any question incident to petitioner's undistributed profits taxable net income for 1936. Findings of Fact Some of the facts have been stipulated, and as stipulated are hereby found accordingly. Petitioner is a New York corporation with its principal office in New York City. It filed its tax returns, prepared on a calendar year accrual basis, with the collector for the third district of New York. It was organized in 1925 as the Manhattan Surface Coach Company, and its name was changed to its present one in 1930, as a result of a merger with The New York City Omnibus Corporation, formed in 1926. Its capital stock was owned by New York Railways Corporation, hereinafter referred to as Railways. Railways succeeded to the interests of the New York Railways Co., when the latter had to be reorganized as a result of financial difficulties. The latter company acquired in 1911, as a result of the reorganization of the Metropolitan Street Railway Co., and others, the franchises *27 of many smaller operating companies, whose history was also marked with financial problems. Railways was incorporated in 1925 and became, after a series of mergers, consolidations, reorganizations, and similar transactions, the operating company of an integrated street railway system in the Borough of Manhattan under perpetual franchises theretofore granted by the City to Railways' predecessor and the latter's predecessors. All of Railways' common stock was, in 1926, acquired by Fifth Avenue Coach Co., hereinafter referred to as Fifth Avenue, which was organized in 1896. At the time of petitioner's incorporation, thought and study had already been given to the possibility of the replacement of streetcars by buses in Manhattan. In February 1925 the Board of Transportation of the City of New York recommended the adoption of a plan for the operation by persons to whom franchises might be granted of omnibus routes in the City of New York. About that time petitioner and others were making applications for motor bus routes to the proper public authorities. By February 23, 1926, plans for motorization of some of the routes on which electric street railway cars were being operated had *28 crystallized sufficiently so that an agreement was entered into between Railways and Fifth Avenue, providing for cooperative effort by the two companies looking to this objective. This agreement provided that five of Railways' loss profitable routes carrying approximately 28 percent of the revenue passengers should be motorized as soon as possible and that Railways should be allowed the sum of $5,400.000 for the electric street railway lines thus motorized. Prior thereto the two companies were competitors. Shortly after the execution of the agreement, Fifth Avenue acquired all of Railways' stock, as heretofore mentioned. These early efforts to secure bus franchises were generally unsuccessful, and it was not until early 1930 that renewed action was undertaken, in response to bids sought by the City authorities. Petitioner replied to this invitation for bids. In the fall of that year the City's Board of Transportation made a formal report to the Board of Estimate and Apportionment relative to pending applications for omnibus franchises. In this report the Board indicated its opinion that the most comprehensive operation possible under a single franchise was preferable to a number *29 of local franchises. The Board stated further that the most comprehensive proposal for Manhattan was the plan for substituting omnibuses for street cars on the lines of Railways, as set forth in a letter from petitioner's president, proposing that the street railway franchises be relinquished and street railway operation abandoned in exchange for franchises for omnibuses. The Board stated: "Through the medium of these proposed changes from street car to omnibus equipment is presented a practicable method of instituting a comprehensive omnibus system in Manhattan." Following the Board's report, petitioner supplemented its earlier applications, in which it sought crosstown routes, by petitioning not only for crosstown routes but also for nine additional routes, these being the routes over which Railways was then operating street cars. But action was delayed on these applications, as the City authorities desired to settle by legal action a question that had been raised concerning the validity of the perpetual franchises of Fifth Avenue. Appropriate proceedings were instituted, and the case was not finally decided until April, 1933. The Court of Appeals of the State of New York having *30 upheld in all respects the validity of the bus franchises granted Fifth Avenue, the Board of Estimate and Apportionment again took up the question of the grant of bus franchises in the Borough of Manhattan. A competitor of Railways known as Greenberg sought to prevent the City from granting omnibus routes to Railways and its subsidiary, and instituted proceedings to that end in the New York State Supreme Court. The case was Greenberg v. O'Brien, 149 Misc. 866 (S. Ct. N. Y. Co., 1933), and it was appealed with the result that the Appellate Division affirmed the decision below (240 App. Div. 970). Both courts held that Greenberg was not entitled to any stay or injunction to interfere with the grant of the omnibus franchise to Railways and petitioner. Thereafter, in 1933, it became apparent that the City desired to have substituted for street cars an integrated bus system under a franchise for a limited period, and to acquire the perpetual street car franchises then held by Railways. It finally decided that its best interests could be served by negotiating with petitioner and Railways. As a result of these negotiations, various contracts were entered *31 into on December 23, 1933, between petitioner and the City, on one hand, and Railways, its constituent companies, and petitioner, on the other. The basic franchise agreement between the City and petitioner provided that petitioner should be granted the privilege of operating omnibuses over the nine routes already being served by Railways, as well as four additional crosstown routes; that the franchise should have a life of twenty-five years; that the City should receive as partial payment, in the case of the nine routes replacing the railway lines, the sum of 3 percent of the gross revenues therefrom, and in the case of the other four routes, 10 percent of the gross revenues therefrom. Various other terms and conditions were included in these 1933 agreements. A plan for the readjustment and motorization of Railways and its subsidiaries was required to be filed with the State Transit Commission. Railways agreed to surrender to the City its perpetual franchises, remove from the streets switches and other facilities of its electric railway, convey to the City its title and interest in the tracks, and pay to the City the sum of $160,000 in lieu of the removal of rails and other facilities *32 from the streets. It was then agreed that omnibuses would be in full operation with eighteen months. Petitioner undertook to comply with the terms of the agreement, but further litigation instituted by Greenberg, in which the City joined, there having been a change of administration, delayed such compliance. Because of this delay and because of the time limitations in the franchise agreement, a prompt termination of the litigation was considered as imperative. This was achieved by the execution of a supplemental contract between the City and petitioner under date of January 29, 1935. The City obtained an option to recapture the omnibus franchise after ten years from the date of the supplemental agreement, under a formula for amortizing a recapture value of $7,500,000 over the remainder of the original term and upon the purchase of the property and equipment of petitioner. The dates for the performance of the various acts required of petitioner were extended. After settlement of the litigation, and on March 19, 1935, a "Plan of Readjustment and Motorization of New York Railways Corporation," a substantially the same as the plan submitted to the Transit Commission, was announced *33 to the security holders of Railways. This plan contemplated that: (a) Petitioner would change its capital structure so that its authorized capital would consist of 700,000 shares of stock having no par value instead of ten shares having a par value of $100 each; (b) The general creditors of Railways would be paid in full in cash; (c) Petitioner would assume all of the bonded indebtedness of Railways, except its indebtedness on its outstanding income bonds; (d) The holders of the income bonds of Railways would receive through Railways upon the surrender of their bonds ten shares of no par value stock and purchase warrants for twelve shares at $10 per share for each $1,000 principal amount of income bonds; (e) Fifth Avenue would exercise all purchase warrant rights not exercised by income bondholders; (f) The holders of preferred stock of Railways would, upon the surrender of their shares, receive option warrants giving them the right to purchase 2 1/2 shares of no par value stock at a price of $17.50 per share at any time within ten years from their date for each ten shares of preferred stock held; (g) The common stockholders of Railways would receive nothing; (h) *34 Fifth Avenue would receive through Railways 10,000 shares, or such part thereof as the Court should direct, of the no par value stock for its services in connection with the execution of the plan; (i) Railways would surrender to petitioner for cancellation the certificates for the ten outstanding shares of petitioner's stock having a par value of $100 each; (j) Railways acquire from Fifth Avenue the indebtedness of petitioner to that company, the stock of Madison Avenue Coach Company, Inc., and the stock of Eighth Avenue Coach Corporation owned by it, and the indebtedness to Fifth Avenue of Madison Avenue Coach Company, Inc., and of Eighth Avenue Coach Corporation; (k) The debt of petitioner to Railways and to Fifth Avenue would be forgiven; (l) Railways, after surrendering its street car franchise and turning over to the City the property mentioned in its contract, dated December 26, 1933, would transfer that part of its remaining assets which were not suitable for bus operations to a new corporation in exchange for all of the capital stock of such new corporation; (m) Railways would transfer to petitioner its remaining assets, including the stock of Madison Avenue Coach *35 Company, Inc., the stock of Eighth Avenue Coach Corporation, the stock of the new corporation, and the indebtedness of Madison Avenue Coach Company, Inc., and Eighth Avenue Coach Corporation to Railways and Fifth Avenue. On July 31, 1935, Railways filed a petition with the United States District Court for the Southern District of New York for reorganization under section 77B of the Federal Bankruptcy Act. By order of the District Court, dated July 31, 1935, the District Court took jurisdiction of the proceeding. Thereupon Railways became and thereafter was a debtor being reorganized under the provisions of section 77B of the Federal Bankruptcy Act. Such status continued during the entire year 1936 and for some time thereafter. During the entire year 1936, and particularly during the period from February 12 to December 24, inclusive, of that year, Railways was subject to and under the control of the orders of the District Court. During the period aforesaid, all the assets of Railways, including its contract franchise rights to operate over and upon certain streets of the City of New York and the capital stock of petitioner, which was owned by Railways, were assets of a debtor in reorganization *36 and were held subject to the control of, and under the orders of, the District Court. On January 10, 1936, the District Court entered an order holding that Railways was insolvent, and approving the proposed plan of reorganization. On January 15, 1936, Railways applied to the Transit Commission for approval of the proposed abandonment of the old electric street railway franchises involved in the plan of motorization, and the Commission entered an order approving such application on January 22, 1936. On the same date the Commission also entered its order authorizing petitioner, as the company designated in the plan to become the operating company, to assume certain bonded indebtedness of Railways aggregating $3,956,321.48, and to issue its no par value common stock as follows: Shares
For cash and property (listed in the
order at an aggregate of $6,587,315.46,
offset, however, by the assumed
bonded indebtedness of $3,956,321.48,
or a net book value of $2,630,993.98)
458,450
For cash (or prior lien bonds at par)
at $17.50 per share
42,633
Total shares authorized
501,083
Although the preferred stockholders of Railways were entitled to participate under *37 the plan of reorganization, in that they were entitled to purchase stock of petitioner in the ratio provided by the plan at $17.50 per share, they objected nevertheless to the approval of the plan on the ground that they were entitled to greater participation than that provided. Accordingly, these stockholders appealed to the United States Circuit of Appeals for the Second Circuit from the decision of the District Court. On March 27, 1936, the Circuit Court affirmed the judgment below. A petition for certiorari filed in the United States Supreme Court by the stockholders was denied on June 1, 1936. On June 3, 1936, the District Court finally and unconditionally approved and confirmed the plan of reorganization, and authorized and directed Railways to abandon its street surface railway routes, to proceed with the preparation of the necessary deeds, instruments, and indentures, and to take the other measures necessary to carry the plan into effect. The Court specifically reserved jurisdiction to supervise and control the making, execution, and delivery of all agreements and all other steps required to consummate the plan of reorganization. The Court also approved certain proposed contracts, *38 later executed, between Railways and Fifth Avenue on the one hand and between Railways and petitioner on the other, outlining and providing for the things to be done by the respective parties to consummate the reorganization. In addition to the order entered by the District Court on June 3, 1936, approving and confirming the plan of reorganization, a further order was entered at the same time authorizing Railways to discontinue permanently all street railway operation and providing further as follows: "Seventh: For the purpose of protecting the rights of the security holders, and pending the preparation, execution and delivery of the instruments and supplemental indentures requisite to effect the transfer of the properties of the Debtor to or for account of the Bus Company and to subject the new franchises and other properties of the Bus Company to the lien of the Prior Lien Mortgage in the manner contemplated by the Plan, it is hereby directed that until the further order of this Court the franchise routes of the Bus Company which correspond to the street railway routes of the Debtor shall be held by the Bus Company for the benefit and protection of the Trustee and the bondholders *39 under the Prior Lien Mortgage, and it is further directed that the entire capital stock of the Bus Company shall be held for the benefit and protection of the Trustee and bondholders under the Income Mortgage, the Trustee and bondholders under the Central Crosstown Mortgage, and the other creditors and stockholders of the Debtor, all to such extent and in such rank as this Court may determine to be fair and equitable in view of the liens, rights and interests presently existing in the street railway routes to be abandoned by the Debtor, and all subject however to such rights and interests in such franchise routes or stock of the Bus Company as this Court may hereafter determine to be equitable; * * *." On June 10, 1936, Railway filed a declaration of abandonment with the Secretary of State of New York. It was, however, impractical for Railways to discontinue street railway operations over all its routes at the same time and it was impractical for petitioner to commence bus operations over all its routes at the same time. It was necessary to acquire 576 buses and to train adequate personnel and to convert car barns into garages by filling in the transfer pits, installing ramps, *40 and gasoline storage tanks. Petitioner commenced the operation of buses over the Broadway-Columbus Avenue route (M-22) on February 12, 1936; it commenced operation of buses over the Seventh Avenue route (M-24) and the 8th Street route (M-16) on March 6, 1936; it commenced operation of buses over the Sixth Avenue route (M-23) on March 12, 1936; it commenced operation of buses over the Lexington Avenue route (M-21) on March 25, 1936; it commenced operation of buses over the 34th Street route (M-19) and the 116th Street route (M-20) on April 1, 1936; it commenced operation of buses over the 23rd Street route (M-18) on April 8, 1936; it commenced operation of buses over the 14th Street route (M-17) on April 20, 1936; it commenced operation of buses over the 86th Street route (M-5) on June 8, 1936; and and it commenced operations of buses over the Spring and Delancey Street route (M-2), the 79th Street route (M-4) and the 96th Street route (M-6) on June 22, 1936. The District Court having retained jurisdiction of Railways' 77B proceeding, entered an order on November 19, 1936, providing for certain steps necessary to consummate the 77B reorganization in conformity with its previous order *41 of June 3, 1936, and approving instruments prepared for the purpose of subjecting the new franchise to the lien of the prior lien bonds, one of Railways' obligations which petitioner was to assume. Previously the prior lien bondholders had been secured by a lien on the electric street railway franchises. The City having consented on November 13, 1936 to the pledging of the omnibus franchise to secure the prior lien bonds, the indentures to accomplish this purpose were executed on November 24, 1936, and November 25, 1936. In order that petitioner be enabled to issue its no par value common stock in exchange for the property and assets of Railways, request was made on December 4, 1936, that the District Court authorize the filing of a "Certificate of Increase and Reclassification of Shares," providing that petitioner's authorized capital stock might consist of 700,000 shares without par value. On the same day the District Court authorized and ordered the following additional steps to be taken to effect the reorganization: (a) Railways and petitioner were authorized and directed to take the necessary steps to have petitioner's new securities issued and listed on the New York Stock *42 Exchange; (b) Railways was directed, in keeping with the plan of reorganization, dated March 19, 1935, to pay to Fifth Avenue the sums necessary to reimburse the latter for its interests in the Madison Avenue Company and the Eighth Avenue Company; (c) Petitioner was directed to pay over to Railways the net earnings for the period February 12, 1936, to October 31, 1936, amounting to $594,776.28. Petitioner had entered into agreements with Railways prior thereto to pay over its earnings to Railways. These agreements are hereinafter more fully described. On December 11, 1936, settlement for the earnings for the period February 12, 1936, to October 31, 1936, was made partly in cash and partly by delivery of petitioner's promissory note. The note was paid on December 24, 1936. The earnings from petitioner's operations for the period November 1, 1936, to December 24, 1936, were paid to the Street Railway Liquidating Corporation, hereinafter referred to as "Liquidating Corporation," as the assignee of Railways on December 30, 1936, in accordance with an order of the Court. The certificate authorizing petitioner's recapitalization having been filed in the meantime, on December 24, 1936, all *43 of the properties and assets of Railways were transferred and conveyed to petitioner, such property and assets consisting, in general, of the following: (1) Railways' beneficial interest, if any, in the omnibus franchise. (2) The capital stock of the Madison Avenue Company, the Eighth Avenue Company and the Liquidating Corporation. (3) Land, buildings, and property. (4) Cash and securities. The agreement of transfer specifically provided that Railways thereby transferred and assigned, and agreed to convey and deliver to petitioner, and petitioner thereby accepted and took over, the right, title, and interest of Railways, its creditors and stockholders in and to the routes, including all beneficial interests, rights, and claims of Railways, its creditors and stockholders. Thereupon petitioner issued 458,450 shares of its no par value capital stock to Railways, such shares being registered in the name of the nominee of Railways. Simultaneously, petitioner executed stock certificates for 42,633 additional shares of its capital stock and caused them to be delivered in escrow to the Commercial National Bank and Trust Company of New York as the warrant agent designated and appointed *44 by Railways to make provisions for the ten-year option warrants to be delivered to preferred stockholders in accordance with the plan of reorganization. The agreement of transfer of December 24, 1936, provided that the warrant agent should hold the 42,633 additional shares of petitioner's capital stock under a warrant agreement which provided that petitioner would receive the sum of $17.50 per share upon exercise of the warrants and that there would be returned to petitioner for cancellation any shares in respect of which the warrants should not be exercised within the period stated in the warrants. Upon issuance of petitioner's new stock without par value the ten shares of stock of petitioner previously outstanding and having a par value of $100 per share were surrendered and cancelled. The agreement further provided that the 458,450 shares of petitioner's stock issued in accordance therewith were issued in conformity with the order of the Transit Commission, dated January 22, 1936, for cash and property as set forth in the said order, and that the other property, rights, and benefits transferred and conveyed, as described in Articles Sixth and Seventh of the agreement of transfer, *45 should not be included in the "stated value" of petitioner's capital stock, therefore, but should be reflected on petitioner's balance sheet as a "contribution to surplus, or by other appropriate designation." The 77B reorganization of Railways was virtually consummated on December 24, 1936, when petitioner acquired all of the former's property and issued its stock therefor. No material changes in the management, personnel or offices occurred as the result of the motorization of Railways' street railway system and the 77B reorganization of the company. Of the 458,450 shares of petitioner's stock issued on the date to the nominee of Railways, the agreement of December 24, 1936, provided that 448,450 shares were distributed to the income bondholders, who were obligated, however, to pay $10 per share for 244.609 of such shares. The other 10,000 shares were issued to compensate Fifth Avenue for its services, subject to the decision of the Court concerning the amount of such compensation. The agreement further provided that the sum of $2,446,090 payable by the income bondholders for 244,609 shares of the stock distributable to them should be available for use by Railways to acquire the *46 notes and accounts payable of Fifth Avenue representing the advances made by the latter to petitioner, the Madison Avenue Company, and the Eighth Avenue Company. The remainder of the fund, after reimbursement of Fifth Avenue, was subject to disbursement in accordance with the orders of the District Court and was available specifically for the payment of reorganization and administration expenses. In the income tax returns of Railways no gain or loss was reported in respect of the abandonment of its franchises on June 10, 1936. Respondent did not advise the company of any changes in the return as filed. The new shares of petitioner's stock and the rights to purchase such stock were distributed to the security holders of Railways on March 15, 1937. The 77B reorganization of Railways was finally terminated on July 23, 1937, by the entry of an appropriate order by the District Court. Additional Findings of Fact with Reference to First Issue The parties being in substantial agreement as to certain items, [1] aggregating $557,214.91, as includible in petitioner's cost basis, the area of disagreement covers three other items: (a) The fair market value of the street railway franchises *47 and other properties given up by Railways and claimed by petitioner to be of a value of $15,500,000; (b) preliminary expenditures for rent, personnel, and the like; and (c) the cost (adjusted) of Uppercu-Cadillac buses, used for experimental purposes, all of which petitioner claims to be in the sum of $318,692.47. In the notice of deficiency, respondent determined "That the sum of $7,087,784.85 represents the maximum cost or value of the omnibus franchise allowable to you subject to amortization." He now contends for a basis for amortization of not in excess of $4,750,000. The general decline in the business of public transportation by electric surface cars was being experienced in Manhattan, and was accentuated to a marked degree by the policies of Railways in failing to place modernized equipment in service. This policy was dictated by the fact that, as heretofore mentioned, there was a growing sentiment that the streetcar system in Manhattan should be replaced by omnibuses. Although *48 the area served experienced a consistent growth of population from 1910 to the 1930's, the number of revenue passengers carried by surface facilities decreased, there being a very sharp decrease in the number carried by street railways. Railways' gross passenger revenues fell almost 50 per cent between 1921 and 1934. Other operating companies showed even greater decreases. In the plan, as adopted on June 10, 1936, Railways' problems and prospects were summarized: "Conditions which have impeded street car operation in large cities are present in the Borough of Manhattan in New York City to an even greater degree than else-where. * * * If New York Railways Corporation should continue to operate street cars substantial expenditures would be required for the purchase of modern cars, for relaying track and rebuilding much of the structure beneath the tracks. The raising of the capital required for continued rail operation, in view of the earnings record and capital structure of the company, would present grave difficulties. Furthermore, even with such outlays there would be no assurance that this additional investment would materially increase earnings or offset the existing disadvantages *49 of street car operation. "The management of New York Railways Corporation has felt for some years that its street cars, should be replaced by modern buses and that the motorization of the New York Railways lines offered the only feasible solution of the company's problem. * * *" In 1936 Railways' rolling stock consisted of approximately 740 cars, most of them built between 1898 and 1908. They were old-fashioned, slow, noisy, and generally regarded as obsolete and unsuited for the needs of the traffic. Its ways and structures, however, were kept in good repair, although considerable replacements and improvements would have been necessary to put the transportation system in really first-class condition. Up to 1932, an annual program of rerailing had been undertaken. Thereafter, a maintenance program was followed, but there were no longer any extensive replacements. It would have been possible to place new equipment in operation without inordinate delay so far as the rails were concerned, but new-type streetcars were becoming available in only limited quantities in 1936. This new type of car was the outgrowth of a development undertaken by the industry in the period of the early *50 1930's to attempt to counteract the financial difficulties being generally suffered by most operating companies. Limited experience with the new cars in other areas indicated an increase in revenues, as well as a decrease in expense, resulting from the use of these cars. Similar results were considered possible in Manhattan by some engineers, who viewed the surface system as primarily one for short hauls, the subway system being used for long hauls and acting as a feeder to the streetcar systems. However, Railways had no intention of moderizing its streetcar system, and, moreover, was in no position financially to undertake such a plan. As the holder of perpetual streetcar franchises, Railways did have the right under State law to petition the State authorities for substitution of buses over its routes, the consent of the City authorities having been first obtained. Based upon book value, Railways' fixed capital as of June 10, 1936, which can form the basis for the cost of the omnibus franchise, was approximately $9,000,000. Based upon the reproduction new at 1936 prices, less depreciation, the figure would be approximately three times as large. Neither figure represents the *51 fair market value of these assets. Railways maintained its books on a calendar-year accounting basis. Its income and expenses for 1935 and for the period January 1, to June 1936, were as follows: 1935
1936 period
Operating income
$468,076.56
($109,133.51)
Non-operating income
78,136.69
13,411.96
Gross income
$546,213.25
($ 95,721.55)
Deductions from gross
income
400,118.88
191,563.69
Net income
$146,094.37
($287,285.24)
Railways balance sheet as of December 31, 1935, was as follows: ASSETS
December 31, 1935
Fixed Capital *
$18,949,197
Cash
535.666
Special Deposits
119,26
Accounts Receivable
130,872
Interest and Dividends Receivable
11,616
Other Notes and Accounts Receivable
962,546
Material and Supplies
138,595
Marketable Securities
495,692
Investments in Controlled Companies - Stocks **
6
Investments in Controlled Companies - Bonds at Cost
Mortgage Receivable
Miscellaneous Investments
619,415
Bills and Accounts Receivable - Controlled Companies
Marketable Securities Borrowed - Per Contra
Miscellaneous Temporary Debits
1,073,423
Investments and Advances - Bus Motorization
Total Assets
$23,036,292
LIABILITIES
Capital Stock
$ 1,442,630
Funded Debt
24,340,423
Taxes Accrued
48,912
Accounts Payable
171,985
Interest on Funded Debt Accrued
147,295
Rent, Etc., Accrued
3,967
Other Unfunded Debt
6,187
Contingent Accounts
Miscellaneous Temporary Credits
10,520
Marketable Securities - Borrowed - Per Contra
Reserves
2,172,840
Surplus ***
(5,308,467)
Total Liabilities
$23,036,292
*52 Prior to the grant of any franchise to petitioner, it acquired 25 Uppercu-Cadillac coaches for the sum of $252,735.40. These buses were purchased in 1925 in anticipation of the motorization of some of the lines and for experimental purposes. The buses were specially designed and a feature was the front-wheel drive. Although the purchase was approved on September 28, 1925, by the Board of Directors of Railways the buses were not delivered until several months later. Funds for the purchase were advanced by Railways and petitioner gave its notes to cover the amount so advanced. The coaches were never used for transportation purposes except that they (1) were rented in 1928 to the Chicago Motor Coach Company for $25,000 *53 plus interest, and (2) a few of the buses (4 were needed but 6 or 8 were used) were operated temporarily on Railways' 14th Street crosstown line when street railway service was interrupted due to construction by the City of New York. The buses were shipped to Chicago on October 4, 1928, and the last one was returned on December 12, 1929. The use of the buses on Railways' 14th Street line covered a period of six months. All of the buses were finally sold for salvage in 1936 for the sum of $1,300. Incidental and prior to the motorization of Railways' electric street railway lines, petitioner incurred considerable expense for training the large number of employees required to operate the buses and for garage rentals for storing the buses, pending the remodeling of Railways' car barns to make them suitable for omnibus garages. The amount of these and similar expenses was $96,300.84 Assets included in the fixed capital of Railways which Railways was allowed to retain under its contract with the City, and which were not transferred to the City, to petitioner, or to petitioner's subsidiary, were sold by Railways for salvage or as usable material for $567,406.79. The sum of $567,406.79 *54 represented the fair value of such assets sold and is the amount which would have been received had the sales been made on June 10, 1936. Petitioner's net income for 1936, commencing February 12, and for each of the years 1937, 1938, and 1939 was as follows: 1936
$ 758,359.19
1937
2,218,319.42
1938
2,182,201.63
1939
2,201,132.90
These figures make no allowance for amortization of the bus franchise and included revenue and expenses from one operation, which is not involved in this proceeding. Income for 1936 was subject to petitioner's obligation to Railways pursuant to contract and the order of the District Court, as hereinafter more fully described. Petitioner's balance sheet, as of December 24, 1936, after giving effect to the entries covered by the agreement of the same date, is as follows: ASSETS
CURRENT ASSETS: Cash
$ 645,275.49
Special Deposits
443,896.90
Accounts Receivable
14,581.57
Interest Receivable
4,064.20
$ 1,107,818.16
MATERIALS AND SUPPLIES
114,937.13
MISCELLANEOUS INVESTMENTS: Capital Stock: Street Railway Liquidating Corporation
1,000.00
Motor Coach Supply Corporation
2,500.00
Madison Avenue Coach Company, Inc.
330,000.00
Eighth Avenue Coach Corporation
300,000.00
Advances to Subsidiary Companies
1,040,477.00
$ 1,673,977.00
FIXED CAPITAL: Organization Expenses
246,000.34
Real Estate - Land
2,850,000.00
Real Estate - Buildings
1,399,000.00
Equipment - Motor Coaches
6,366,440.00
Equipment - Service Cars
6,673.12
Shop Tools and Machinery
13,040.58
Office Furniture and Fixtures
10,642.60
Improvements on Leasehold Property
9,116.20
Miscellaneous Equipment
127,298.88
Other Fixed Capital
$11,028,211,72
MISCELLANEOUS TEMPORARY DEBITS: Construction in Process
8,598.05
Prepayments: Taxes, License Fees, Rents, etc.
8,856.90
Insurance Premiums
11,237.18
Other Prepayments
3,660.69
Suspense: Amount to be Amortized Under Recapture Contract
7,087,784.85
Miscellaneous
2,762.69
$ 7,122,900.36
TOTAL
$21,047,844.37
LIABILITIES
CURRENT LIABILITIES: Taxes Accrued
$ 56,378.58
Accounts Payable
444,042.07
Interest on Funded Debt Accrued
24,916.65
$ 525,337.30
FUNDED DEBT: Sixth Avenue Purchase Mortgage 5% Bonds
286,015.00
Central Crosstown Purchase Mortgage 6% Bonds
115,000.00
Prior Lien Mortgage 6% Bonds
3,555,306.48
Equipment Obligations
4,833,051.48
$ 8,789,372.96
RESERVES: Depreciation of -
Buildings
3,407.35
Shop Tools, Machinery, Office Furniture and Fixtures
935.19
Maintenance and Depreciation of Vehicle Equipment
720,486.35
Amortization of Miscellaneous Equipment
1,387.29
Amortization of Other Capital
7,814.44
Amortization of Improvements on Leasehold Property
5,345.43
Accrued Amortization of Recapture Contract
388,879.35
Injury and Damage Claims
217,908.71
$ 1,346,164.11
MISCELLANEOUS TEMPORARY CREDITS
1,040,477.00
CREDIT IN RESPECT OF AMOUNT TO BE AMORTIZED UNDER
RECAPTURE CONTRACT
6,698,905.50
CAPITAL STOCK
2,630,993.98
CAPITAL SURPLUS
16,593.52
TOTAL
$21,047,844.37
*55 Petitioner's capital stock was listed on the New York Stock Exchange on March 15, 1937. During the period from 1937 to 1939 the stock fluctuated widely from a low of 15, which occurred in October 1937, to a high of 43 in March 1939. Petitioner carried the cost of the omnibus franchise on its books at $7,087,784.85. The recapture value of $7,500,000, recited in the supplemental agreement between petitioner and the City, was determined by considering the value of the street railway franchises and properties which had to be abandoned and surrendered in order to motorize the system. Petitioner's cost basis for purposes of amortization of its omnibus franchise is $7,087,784.85. Additional Findings of Fact with Reference to Second Issue Since it was impractical and virtually impossible for petitioner to change at one time completely from a railway system to a bus system, but operations were instituted at different times over the various routes. The first bus line was placed in operation on February 12, 1936, under the basic franchise agreement. It was not, however, until June 10, 1936, that the last streetcar operation ceased, and Railways surrendered its franchises to the City. *56 [2]
On December 24, 1936, the agreement of transfer between petitioner and Railways was executed and the transfers of property and stock were completed. The period of useful life of petitioner's omnibus franchise for purposes of depreciation commenced as of February 12, 1936. Additional Findings of Fact with Reference to Third Issue In its original tax returns for 1936 to 1939 petitioner claimed depreciation on its buses, there being over 625, based upon a useful life of seven years. Respondent did not disturb the claimed rate for 1936, but for the other years reduced the allowances, using as a base a nine-year life expectancy. Petitioner now seeks to use a ten-year life for all of the years involved. The buses used by petitioner during these years were substantially similar to those heretofore and then being used by Fifth Avenue. They were, however, of different body style, being single deck coaches, whereas Fifth Avenue used "double-deckers." Petitioner had a thorough inspection and servicing policy, and at all times attempted to keep its coaches in good operating condition. *57 The policy adopted was one that had been followed for many years earlier by Fifth Avenue. In fact, both companies had, for some time, common general shops for servicing and repairs. The useful life of over 500 similar buses placed in operation between 1916 and 1923 by Fifth Avenue average over ten years. Petitioner's actual experience has demonstrated that its buses have a useful life of ten years. For purposes of depreciation, petitioner's buses have a useful life of ten years for all years involved. Additional Findings of Fact with Reference to Fourth Issue On January 29, 1936, the District Court entered its order authorizing Railways to reduce the operation of its Broadway-Columbus Avenue street railway route and to permit petitioner to operate omnibuses over the route, provided that the parties should enter into an agreement to insure that the operation of omnibuses upon the route should be for the benefit and account of Railways. Thereafter further similar orders were entered by the District Court on February 28, 1936, March 6, 1936, March 30, 1936, and June 3, 1936, authorizing Railways to reduce street car operations on the other routes in the system and to enter *58 into agreements with petitioner whereby the latter would be permitted to operate omnibuses upon these routes, provided that such operation should be for the account of Railways. In accordance with the orders of the District Court, agreements between Railways and petitioner were duly entered into on February 1, 1936, March 5, 1936, March 11, 1936, March 24, 1936, and June 3, 1936, providing for the reduction of street railway operations by Railways and authorizing petitioner to commence omnibus operation over the respective routes. The agreements specifically provided: "It is hereby agreed that the operation of the said routes by the Omnibus Corporation shall be for the benefit and account of the Railways Corporation, that the Omnibus Corporation will render accountings to the Railways Corporation for such operation, and that the Omnibus Corporation will hold all net earnings from such operation subject to such disposition as the United States District Court for the Southern District of New York shall determine." In conformity with the orders of the District Court and the agreements, petitioner commenced operation of buses on February 12, 1936, over the Broadway-Columbus Avenue *59 route. Thereafter, it commenced operation from time to time on the other routes of Railways until all of the old street railway franchise routes were being served by buses, including the 86th Street crosstown route. The operation of omnibuses on the remaining three new crosstown routes commenced June 22, 1936. By motorizing the routes one or two at a time and spreading the period of motorization over a period of approximately four months it was possible to accomplish the change-over from street car operation to bus operation smoothly and without disruption of the transportation service provided the public on these routes. Operation by petitioner under these agreements, pursuant to the District Court orders, continued until December 24, 1936. The earnings from bus operations for the period February 12, 1936, to December 24, 1936, accounted for and paid by petitioner to Railways or its assignee was $743,729.09. In Railways' and in petitioner's income tax returns for 1936 these earnings were treated as the income of Railways. In the computation of the amounts due to Railways no franchise depreciation was deducted. Respondent determined that these earnings constituted the income of *60 petitioner, and allowed no offsetting deductions or credits for these payments. Additional Findings of Fact with Reference to Fifth Issue To provide for injury and damage claims resulting from accidents during the period February 12, 1936, to December 24, 1936, petitioner entered upon its books of account a reserve, so-called, computed at 5 1/2 percent of the gross revenues, as required by the State Public Service Commission. The credits to the reserve for the period in question aggregated $291,105.58. In computing the amount of the earnings for the same period, accounted for by petitioner to Railways, the amount of the unexpended balance in the aforesaid reserve for injuries and damages was deducted. By agreements between petitioner and Railways relative to bus operations during the period February 12, 1936, to December 24, 1936, petitioner was constituted the agent of Railways to pay and settle all obligations on account of injury and damage claims attributable to such operations, and it was further agreed that petitioner should account to Railways for the unexpended balance, if any, in the reserve account after the payment of such claims. Respondent disallowed the sum of *61 $217,908.71 as a deduction from petitioner's income for 1936, on the ground that this amount represented the unexpended part on December 31, 1936 "of a contingent reserve set aside and retained by petitioner." Respondent did allow as a deduction the amount actually paid out in 1936. The entire amount of the unexpended balance in question was paid out during the years 1937, 1938, and 1939 in settlement of the 1936 claims and such payments were allowed by respondent as deductions for those years as follows: 1937
$114,173.90
1938
92,406.50
1939
11,328.31
Total
$217,908.71
Opinion 1. The issue as to petitioner's cost basis of its franchise for amortization purposes can, we believe, be satisfactorily resolved by the application of the principle of burden of proof. Nathan Cohen, 7 T.C. 1002. The chief difference between the parties on this problem relates to the June 10, 1936, value of the franchises surrendered and property conveyed by petitioner's predecessor. The voluminous evidence adduced by each party consisted largely of opinion evidence of valuation engineers, whose task, at best, was fraught with difficulties, as assumption had to be heaped *62 on assumption from major premise to ultimate conclusion. The weight, if any, which should be given to this evidence is the task of this Court. Gloyd v. Commissioner, (CCA-8) 63 Fed. (2d) 649, certiorari denied, 290 U.S. 633; Twin Ports Bridge Co., 27 B.T.A. 346. Petitioner's experts emphasized those elements which would lead to a high valuation figure and minimized or disregarded equally salient elements which would impel a different result. [3] Respondent's expert approached the problem in somewhat opposite fashion. [4]
*63 The result is petitioner's contention for a basis of over $16,000,000, whereas respondent urges that slightly less than $5,000,000 is the correct figure, although he does recognize that upon somewhat different hypotheses $6,000,000 can be justified. Respondent allowed slightly over $7,000,000 as the basis in the notice of deficiency. The burden of reducing the figure below this would fall upon him. Rule 32, Rules of Practice before the Tax Court; Kimbell-Diamond Milling Co., 10 T.C. 7. The burden of increasing it is, of course, petitioner's. Rule 32, op. cit. supra; Tabor Mfg. Co., 10 B.T.A. 1197. We fully recognize the thoroughness with which each party essayed to establish its figure as the proper one. We have carefully considered all of the evidence which has been presented to us, and the many varied arguments advanced by the parties, but we are not convinced that the evidence, although voluminous, is sufficiently compelling to conclude that either party has borne the burden cast upon it. "For practical purposes, it can be said that the record * * * is as *64 strong - or as weak - in favor of one party to the controversy as of the other." Nathan Cohen, supra, 1012. However, a finding of a precise amount must be made. See Estate of Amy H. DuPuy, 9 T.C. 276, 284. This, we have concluded, should be the figure determined by respondent in the deficiency notice, and found by us as a fact to be petitioner's cost basis for amortization purposes. We agree with respondent that petitioner can not properly include in such basis the adjusted cost of the Uppercu-Cadillac buses and certain training expenses, garage rentals, and the like. Aside from other objections, petitioner has failed to demonstrate that the buses were used in any of the operations under the franchise or that the experimentation was in anywise reasonably related to its acquisition. Moreover, it is not unlikely that some portion, if not all, of the questioned amount might have been taken as a loss in the proper year when the experiment in which they were used was finally abandoned as being unsuccessful. J. Weingarten, Inc., 44 B.T.A. 798. As to the expense items, they were just what they were denominated - expenses of operating the buses *65 under the franchise - and were obviously not the proper subject of capitalization. Cf. Warner Mountains Lumber Co., 9 T.C. 1204. Internal Revenue Code, section 23 (a) (1) (A). There was no justification for including in petitioner's basis the valuation of the properties abandoned or scrapped by Railways, for which the latter received about $567,000. Petitioner urges that the value of these items of property comprised part of its cost, relying upon such cases, among others, as Commissioner v. Estate of Edgar S. Appleby, (CCA-2) 123 Fed. (2d) 700, affirming 41 B.T.A. 18; and Laurene Walker Berger, et al., 7 T.C. 1339. Some of the cases cited by petitioner concern themselves with the basis of new property where the old property is demolished to make room for the new structure; the others, with the treatment to be accorded amounts given to cancel an old lease in order to obtain a new one. As to the application here of both groups of these cases, the same weakness exists - the accounts of only one taxpayer were there involved. Here, petitioner indirectly seeks to benefit from a purported loss suffered by Railways. *66 This it can not do, as it must use its own cost as basis and not the basis in the hands of Railways. We must assume that Railways recovered the full June 1936 value of those abandoned and scrapped assets and, hence, petitioner was not, and could not be, obliged to pay for them, or assume any obligation whatsoever with respect to them. So it is apparent that petitioner's basis can not be increased by their value. 2. The period during which petitioner's cost for its franchise is amortizable is the useful life of the franchise. There is no dispute between the parties as to when the useful life will terminate. There is also no dispute that the period should commence as of the time of the first use by petitioner of the franchise for the purpose for which it was acquired. Cf. St. Louis Malleable Casting Co., 9 B.T.A. 110. The only real question that is presented is as to the time of commencement of such use. Notwithstanding that Railways had some beneficial interest in the franchise during the interim period from February 12 to December 24, 1936, particularly by virtue of its power *67 to cause, by a refusal to act, a possible defeasance of the franchise, and its right to all the net earnings of the bus operations during that time, we do not believe that petitioner can avail itself of that fact to seek postponement of the date when the useful life of the franchise in its hands commenced. It is stipulated: "In conducting these [bus] operations during the period February 12 to December 24, 1936, Omnibus used the Basic Franchise * * *." This use, of course, was of distinct benefit to Railways, the recipient of all the net earnings, but such use was also of material advantage to petitioner as a means for the orderly institution of its bus operations. In these operations petitioners used not only the basic franchise but its other assets, and on those of a depreciable nature depreciation was taken in computing the net earnings. There is no disagreement between the parties that these operations were undertaken on February 12 pursuant to orders of the Transit Commission of January authorizing petitioner to become the operating company under the plan of reorganization and the order of the District Court and the subsequent agreements between petitioner and Railways. *68 Without the use of such franchise, petitioner could not have commenced the bus operations. We believe that the appropriate time for the commencement of the amortization period was February 12, 1936. It marks the first time that the franchise was used for the purpose for which it was acquired. It is apparent from the facts that the City would not and did not grant the bus franchise to Railways, the granting being directly to petitioner, and this is as Railways, petitioner, and the other interested parties intended. Whatever beneficial interest Railways may have had in the franchise arose as the result of the complicated and unusual transactions set out in our findings and referred to above, requiring petitioner to pay over to it the earnings during the interim period. The presence of such a temporary and incidental beneficial interest in the franchise in Railways can not of itself vary the appropriate time for the beginning of the amortization by petitioner of a franchise held and used by petitioner. Cf. Helvering v. Lazarus & Co., 308 U.S. 252. That the franchise was subject to subsequent conditions of defeasance within control of Railways or that it could be recaptured *69 by the City does not compel a different result. Cleveland Railway Co., 36 B.T.A. 208. It is our conclusion that the useful life of the franchise to petitioner commenced on February 12, 1936, and we have found that to be the fact. 3. Although petitioner claimed on its tax returns for the years 1936 to 1939 depreciation on its buses based on a 7-year life, it is not now precluded from urging, as it does urge, a different rate for the years that are before us, having assigned this as error in its petition. Swoby Corporation, 9 T.C. 887. It explains its original use of the 7-year life as a convenient, but erroneous, method adopted by its accounting office since the buses were purchased on terms of 10 per cent down and the balance payable in installments over a seven-year period. Respondent's only attack on the use of the ten-year life, for which petitioner contends, is that the petitioner was to be put to its burden of proving the matter of the correct rate. Respondent has offered no evidence whatsoever. Petitioner, on the other hand, has presented convincing evidence of the ten-year life. It had the long prior experience of Fifth Avenue which, together *70 with other conditions known to exist at the end of the period for which each return was made, Wier Long Leaf Lumber Co., 9 T.C. 990, supports petitioner's position. So, also, does respondent's own view that "In the absence of special circumstances" the useful life of urban buses is ten years. Bureau Bulletin "F" (revised January 1942), p. 63. On this point respondent's determination is overruled. 4. We believe that petitioner is not taxable on the net earnings during the interim period, which it was required by court order and by contract to pay over and did pay over to Railways and its nominee. The result is the same whether the amount of net earnings is considered as not reportable income of petitioner or whether it is considered as an allowable deduction for that year. If the amount is an allowable deduction, we then need not dwell on the proposition of whose income it is for tax purposes. The need of petitioner to commence its bus operations under some practicable and orderly method was one of the motivating forces in dictating the course of dealings that was ordered by the Federal District Court and agreed upon by petitioner and Railways. Under the unusual *71 facts that have been presented to us in this proceeding, the earnings are to be considered, we believe, as payments made by petitioner to Railways in order that it might commence operations at an earlier time than otherwise would have been possible and, therefore, a deduction in the total amount paid over by petitioner is proper. It is respondent's contention in this respect that if the amount is said to be a cost of doing business then it is not a cost solely for doing business in 1936, but rather an amount paid for the privilege of doing business for at least the period of the basic franchise. This approach, we observe, is contrary to respondent's own position under the first issue, namely, that the amount is not includible in petitioner's franchise basis. [5] Without relying upon this inconsistency, we would, nevertheless, conclude that the amount is to be considered as an expenditure for a capital item, the capital item to be acquired being the right and privilege to operate buses not during the life of the basic franchise, but only for a period of less than one year, that period from February 12, to December 24, 1936, during which Railways had some limited interest in the franchise *72 to which we have referred under the second issue. As such, deduction therefore would be the full amount paid and would be properly deductible as a business expense in 1936. The J. E. Mergott Co., 11 T.C. 47; W. B. Harbeson Lumber Co., 24 B.T.A. 542. See Dallas Athletic Ass'n, 8 B.T.A. 1036. The result would not be otherwise even if we were to assume that some incidental benefit beyond December 1936 would accrue to petitioner by virtue of the more orderly institution of bus operations, which resulted from its agreements with Railways. See Reserve Natural Gas Co. of Louisiana, 12 B.T.A. 219. 5. With reference to the issue as to the amounts set apart by petitioner in the so-called reserve for accident and damage claims, respondent in his reply brief properly recognizes: "* * * Some *73 argument is made by petitioner that so long as by contract it was obliged to pay over to Railways any unexpended portion of the reserve, then there was a liability at the close of 1936 either to the claimants or to Railways. To the extent, of course, that there was any obligation to Railways, such obligation would be to pay over petitioner's own profits, and the question thus would fall in the same controversial category as the earnings of $743,729.09 hereinbefore discussed." Our conclusion under the fourth issue is dispositive of this question. Moreover, although the amount was denominated a reserve, it actually represented a fixed liability of petitioner in the total amount in the year 1936. Whatever part of the so-called reserve which was not paid out on account of injury or damage claims had to be paid over by petitioner to Railways. It was accordingly a proper deduction by an accrual-basis taxpayer in that year even though designated a "reserve". Kleeman Dry Goods Co., 2 B.T.A. 369. On this issue also petitioner is sustained. Decision will be entered under Rule 50. Footnotes
1. Petitioner's annual payments to the City were expensed and not capitalized. Respondent does not question this method of treatment, and no issue as to that is raised in this proceeding.↩
*. Fixed Capital stated at appraised value at May 1, 1925 plus subsequent additions at cost. Includes $1,000 for franchises. ↩
**. Stated at appraised value at May 1, 1925 of Controlled Companies' Properties, less Controlled Companies' Funded Debt outstanding at that date. ↩
***. Does not include any accumulated and unpaid interest on Forty-Year 6% Income Gold Bonds. The accumulated and unpaid interest on said bonds amounted to $13,652,411.52 (66%) on December 31, 1935.↩
2. The operation of buses on three new crosstown routes did not begin until June 22, 1936.↩
3. Among other things, the approach of petitioner's witnesses was to magnify the potentialities of increased traffic which would result from the use of new equipment, such equipment then being available only in very limited quantities; to assume interest rates actually lower than those required of Railways; to disregard the recapture feature of the franchise and to fail to give due weight to its limited life. Little, if any, significance was attached to the long and financially unsuccessful past history of surface transportation in Manhattan and to the fact that the rehabilitation of street, electric car operation, under all of the attendant circumstances, would be, at the best, a dubious possibility. ↩
4. He believed that Railways' franchises had no value whatsoever for continued streetcar operations. He regarded them as having only a "nuisance" value. He recognized that on the basis of capitalization of prospective earnings a value of about $6,000,000 might be supportable. His analysis, like petitioner's, can hardly be regarded as completely acceptable. A basis of theoretical earnings below that justified by past experience was used. Proper consideration was not given to ultimate savings that were reasonably possible from new operations and other obvious improvements, while initial expenses of such transformation were given undue and unfavorable weight.↩
5. In respondent's first amended answer these payments were treated as part of the cost of the franchise, but they were excluded from such costs in respondent's second amended answer. In conformity with the second amended answer, respondent's argument on the first issue in his brief does not seek to include the payments as part of the costs.↩