Hillcone Steamship Company v. Commissioner.
Hillcone S.S. Co. v. Commissioner
Docket No. 69917.
United States Tax Court
T.C. Memo 1963-220; 1963 Tax Ct. Memo LEXIS 120; 22 T.C.M. (CCH) 1096; T.C.M. (RIA) 63220; August 21, 1963
*120 Business deductions: Farming expenses: Farming as a trade or business. - An oil tanker corporation that operated a farm which it had purchased from its sole stockholder was entitled to a deduction for expenses incurred in the operation of the farm because there was sufficient evidence to show that the farm was operated as a trade or business for the purpose of making a profit. Depreciation: Equipment placed in service. - A claimed depreciation deduction for a rock crushing plant was properly disallowed where there was no showing that the plant had ever been placed into service. Losses: Abandonment of equipment: Fact finding. - An abandonment loss deduction was denied because there was no showing that any real effort had been made to sell the equipment; that there was no market for it; and that the equipment had been written off on the corporation's books. Depreciation: Livestock: Trade or business. - In view of the court's finding that a corporation operated a farm as a trade or business, the corporation was entitled to deduct a depreciation allowance for breeding cattle on the farm. Samuel Taylor, 1308 Balfour Bldg., San Francisco, Calif., and Allen E. Kline, for the petitioner. Leo A. McLaughlin, Aaron S. Resnik, and Sidney U. Hikan, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax for the fiscal years ended June 30, 1952, 1953, and 1954 in the amounts of $172,333.42, $312,037.23, and $3,287.76, respectively. Petitioner claims an overpayment of $20,898 for the fiscal year ended June 30, 1953. Petitioner claims a net operating loss carryback from its fiscal year ended June 30, 1955, to its fiscal year ended June 30, 1953. A number of issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision the following issues: (1) Whether petitioner is entitled to deduct all or *122 any portion of the expenses incurred in its operation of a farm to the extent that such expenses exceed its gross receipts from such farm operation for its fiscal years ended June 30, 1953, 1954, and 1955. (2) Whether petitioner is entitled to a depreciation deduction on rock crushing equipment in its fiscal years ended June 30, 1954 and 1955. (3) Whether petitioner is entitled to a deduction for its basis in rock crushing equipment less a salvage value of such equipment in 1955 because of the abandonment of the equipment in that year. (4) Whether petitioner is entitled to a depreciation deduction in each of its fiscal years 1954 and 1955 on breeding cattle. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner is a corporation, organized in 1929 under the laws of Nevada. Petitioner's principal office is located in San Francisco, California, and its corporate income tax returns for its fiscal years ended June 30, 1952, 1953, 1954, and 1955 were filed with the district director of internal revenue at San Francisco, California. At all times material hereto petitioner kept its books and filed its Federal income tax returns on an accrual *123 basis of accounting and for a fiscal year ended June 30. From the date of its incorporation throughout the fiscal years here involved petitioner's principal business was owning, operating, and chartering oil tankers. During the years here involved petitioner owned and operated six oil tankers which were chartered to various oil companies. Although petitioner's articles of incorporation do not specifically include among its objects or purposes the operation of a farm, mining, or cutting of timber, these articles state the objects and purposes for which the corporation was formed in broad terms including "to carry on and undertake any other business of any kind or character which may seem to the company capable of being carried on for the purpose of enhancing the value of any of the corporation's property * * *." From the date of its incorporation until the early part of 1951, petitioner's stock was owned equally by J. J. Coney, Stanley Hiller, and E. B. DeGolia. In January 1951 J. J. Coney (hereinafter referred to as Coney) became the sole stockholder of petitioner as a result of petitioner's redeeming all of DeGolia's stock and Coney's purchasing all of Stanley Hiller's stock. *124 On January 16, 1951 Stanleyhiller granted Coney an option which Coney timely exercised to purchase all of his stock in petitioner for $595,000, of which $170,000 was paid immediately and the balance in installments. In January 1951, Coney owned a ranch (hereinafter referred to as Annadel Farms) located in Sonoma County, California, approximately 7 1/2 miles east of Santa Rosa, California and 55 miles nor,h of San Francisco. In January 1951 Annadel Farms consisted of approximately 6,000 contiguous acres embracing an area of approximately 10 square miles. About 1 year prior to January 1951 Coney had received a bona fide offer from an unrelated party to purchase from him Annadel Farms for $1,000,000 but had refused the offer. Pursuant to an authorization of its board of directors made on January 15, 1951, petitioner purchased Annadel Farms from Coney on February 9, 1951 for $600,000, $264,000 of which was payable immediately and the remainder in installments. Coney sold Annadel Farms to petitioner in order to obtain the necessary cash to purchase Stanley Hiller's stock in petitioner. Coney had acquired Annadel Farms in various parcels over a period of years, the largest parcel *125 of about 3,400 acres having been purchased by him in 1930 for $175,000. He acquired the last parcel which completed the 6,000 acres in 1935 or 1936. Coney is a naval architect and a businessman. Prior to World War I he served as a navel architect and chief engineer in various shipbuilding companies. After World War I he served as naval architect and chief engineer for the Union Construction Company, taking over that company on liquidation and starting his own company, Pacific Coast Engineering Company. After forming petitioner Coney entered into several mining ventures. During World War II he acted as general agent, president, and manager for a steamship company operating 35 ships worldwide. Coney served as a member of the War Labor Board during World War II and as a member of the Tank Allocation Committee of the American Merchant Marine. He has operated container ships, an oil drilling company, and an oil refinery. Coney's only experience with farming consists of his association with Annadel Farms. Coney had operated Annadel Farms from the time he acquired it until he sold it to petitioner. At the date Coney sold Annadel Farms to petitioner, he had a net worth of between $3,000,000 *126 and $4,000,000. At the time Coney acquired the original 3,400 acres of Annadel Farms in 1930 he had a nominal net worth and could not have afforded to purchase the property except for the fact that the seller gave him very favorable terms requiring a down payment of only $10,000 with the balance payable over a number of years. The prior owners of Annadel Farms had used the property for growing hops, apricots, plums and pears and for grazing or pasturing cattle. There were various improvements on the property when Coney acquired it including a ranchhouse, barns, warehouses, a cooler house, a hopman's house, two or three windmills, a water pumping system, and a 22-acre hop yard. In 1935, out of the total 6,000 acres, in addition to the fruit orchards and hop yard, there were approximately 2,500 acres of good grazing land, 2,000 acres of marginal grazing land, and timberland with fir, eucalyptus, some red oak and some scrub oak growing on it. There were also deposits of rhyolite, perlite, and basalt rock located on Annadel Farms at that time. After acquiring the first portion of Annadel Farms in 1930, Coney continued with the growing of hops, apricots and peaches, and the grazing *127 of cattle. Coney made a profit on the prune, pear and apricot orchards shortly after he purchased Annadel Farms, but abandoned these orchards about 5 years later when this operation proved unprofitable. When Coney acquired the first parcel of Annadel Farms, the hop yard was under lease. Coney continued this lease arrangement until 1937, and under this arrangement he received one-fourth of the crop. Upon termination of the lease Coney hired a foreman to operate the hop yard. While Coney owned Annadel Farms individually, he made various improvements to the property. He increased the hop yard from 22 to 45 acres, added two sections to the hop cooler, constructed a hop press, raised the hop poles and trellis wires from 12 to 20 feet high, added a number of wells, and constructed four houses for employees, a horse barn and a machine shop. Coney also raised a herd of purebred shorthorn cattle, and by 1951 the herd consisted of approximately 300 head of cattle. Coney's herd of purebred shorthorn cattle won numerous awards and was nationally known. His cattle were shown throughout the country. It is advantageous to show purebred cattle since the winning of a gold medal or a blue ribbon *128 generally increases the sales price of the offspring. Bulls from Coney's herd sold for as high as $1,500 each. When Coney sold Annadel Farms to petitioner, petitioner did not acquire Coney's purebred shorthorn cattle. Coney sold these cattle shortly after selling Annadel Farms because he was not making a profit from raising them. When petitioner purchased Annadel Farms from Coney there were 400 acres of crops under cultivation including 45 acres of hops, 20 acres of alfalfa, and the balance planted in oat, hay, corn, and barley. The improvements which petitioner acquired with Annadel Farms when it purchased the farm from petitioner included a large cattle barn, a bull barn, two warehouses, a truck carport, a granary with a mill for grinding grain for feeding cattle, a storehouse, a warehouse, a machine shop, two silos, cattle dipping pens and vat, corrals, a cattle squeeze, a cattleman's house, and two houses for employees on the portion of the ranch used in connection with the cattle operations. On the portion of the farm used in connection with the hop operation, the improvements acquired by petitioner consisted of a double kiln building made of stone with furnaces, drying floors *129 and exhaust fan, a 3-story cooler building, a baling machine, a hopman's house, a dormitory for hop workers, and a machine shop. Petitioner also acquired in improvements, a large horse barn, various corrals, a horseman's house, other barns, carports, corrals, wells, springs, a lake, and approximately 75 miles of roads and 40 or 50 miles of fences and cross fences, and the main ranchhouse. In addition to the buildings, petitioner acquired at the time it purchased Annadel Farms, farm machinery and equipment which included a bulldozer, various tractors which cost from $6,000 to $12,000 each, discs, harrows, subsoilers, seeders, harvesters, hay balers, a machine for harvesting and sacking oats and barley, hay rakes, manure spreaders, specialized equipment for cultivating and harvesting hops, and numerous trucks. Petitioner showed certain of the assets it acquired from Coney in 1951 as depreciable property used in its business and computed depreciation on these assets. During the period that Coney had operated Annadel Farms, his average yield per acre of hops had been 6 to 7 bales. A bale of hops contains 200 pounds. There were other hop farms in Sonoma County, California from which the *130 yield was 8 to 11 bales per acre. In the latter part of 1951, petitioner caused a hop culture survey to be made by one of its employees. The two opening paragraphs of this report are: At the suggestion of Mr. J. J. Coney the following data and information having to do with the growing of hops has been compiled. Mr. Coney's purpose is in the interest of the Annadel Farm hop field and with a determination to produce a hop crop at Annadel that will be comparable to the best yields of the district or know the reason why. The report refers to interviews with a number of individuals and contains various data compiled with respect to hop growing. In 1951 the hop acreage at Annadel Farms was increased to 61 acres and in 1953 and 1954 the hop acreage was 65 acres. In 1951 petitioner purchased a stationary hop picking machine for $33,239.76, installed a hop irrigation system at a cost of approximately $22,000, improved the hop kilns at a cost of $5,173.85, and erected additional hop poles and trellis wires at a cost of $2,832.58. The cost of all of these improvements was capitalized by petitioner. Petitioner paid the hop foreman whom it employed $400 per month and gave him the use *131 of a house on the farm. During the growing season petitioner employed about 20 men for cultivating and training the hop vines and employed a hop crew of about 200 men during the harvesting season. During the dormant period after the harvesting, as few as three persons were employed by petitioner in its hop operation. The average yield per acre of crops harvested and average price per pound of hops in California for the years 1949 through 1956 were as follows: Yield
Crop
per acre
Price per
Year
harvested
pound [1]
Pounds
Dollars
1949
1,665
.58
1950
1,735
.61
1951
1,530
.71
1952
1,675
.60
1953
1,525
.50
1954
1,600
.43
1955
1,560
.44
1956
1,350
.51
Petitioner's hop yield for the year 1951 was 147 bales or 2.41 bales per acre from the 61 acres under cultivation for that year; for 1952 the yield was 284 bales or 4.65 bales per acre; and for the years 1953 and 1954 the yields were 173 and 237 bales, respectively, or approximately 2.66 and 3.65 bales per acre, respectively for the 61 to 65 acres under cultivation. With these low yields and the decline in hop prices petitioner sustained *132 losses in each of these years from its hop operations. Petitioner did not plant a hop crop after 1954 and in 1956 petitioner permanently abandoned its hop operation by tearing out the fences, removing the poles and trellis wires, and selling the hop machinery. Petitioner abandoned the hop operation because it was losing money on the operation and its water supply had been diminished. In 1954 when petitioner decided not to plant a hop crop for the following year and was considering abandoning the growing of hops, petitioner considered the planting of lima beans, strawberries, roses, and safflower in the irrigated acreage that it had available for cultivation. In 1954 petitioner planted 68 acres of lima beans at Annadel Farms. Lima beans were not a common crop in the Sonoma Valley, but were a crop that was raised in the interior valleys. Due to unseasonable weather the night before the lima beans were to be harvested, petitioner lost the entire crop. Petitioner has made no further attempts to grow lima beans at Annadel Farms. On or about November 4, 1952, petitioner entered into a pasturage agreement with Irving L. Brooks under which petitioner agreed to and did pasture and care *133 for 224 white-faced Hereford cows and 14 registered white-faced Hereford bulls owned by Brooks in return for 60 percent of the gain in weight of the cattle and 60 percent of all calves born during the term of the agreement. In the summer of 1953 the Brooks cattle were sold and petitioner's share of the net proceeds amounted to $3,919.34. At that time petitioner purchased 70 of the Brooks cows for $100 each plus 9 calves for $180 to form the basis of its own herd. The Brooks cows were unregistered purebred cattle. If they had been registered, they would have been worth at least $300 to $350 an animal. The cost of raising cattle which are not registered is less than the cost of raising registered cattle. In January 1954 petitioner purchased three bulls for $300 each to use for breeding purposes and developing its herd of cattle. On or about December 22, 1953, petitioner entered into a pasturage agreement with G. J. Ticoulat and in accordance with the terms thereof petitioner pastured at Annadel Farms 70 cows, 75 calves, and 7 bulls at a monthly pasturage fee of $3 for each cow, $1.75 for each calf, and $25 for the 7 bulls. In addition to the pasturage for these cattle, petitioner agreed *134 to furnish 15 to 20 tons of hay for the cattle at a price of $20 per ton. There were adequate facilities at Annadel Farms for the pasturage and raising of cattle including cow barns, bull barns, corrals, silos, a granary, and other related buildings. There was an adequate water supply and sufficient good grazing and pasture land. For several years prior to 1956 petitioner had under consideration the increasing of its available irrigated pasture land by the construction of a large dam and water reservoir. The construction of this dam and reservoir was begun by petitioner in 1956 and completed in 1957 at a cost of $31,977.84. Petitioner named the lake created by the dam Lake Ilsanjo and stocked this lake with fish. During the years here involved petitioner employed a full-time cattleman at a salary of from $250 to $300 a month plus the use of a house on the ranch. During all of the years here involved petitioner had several hundred acres of field crops under cultivation including alfalfa, hay, oats, corn, vetch, and barley. These crops were used as feed for the cattle at Annadel Farms. Pursuant to agreements with the city of Santa Rosa, California, two of the owners of property *135 adjacent to Annadel Farms completed two deep wells in June 1955 and September 1955, respectively, and began to pump water to supply the city of Santa Rosa, California. Shortly thereafter petitioner's lake and springs on its upper pastures dried up. The capacity of petitioner's wells diminished. Because of lack of water in the upper pastures petitioner found it necessary to remove the cattle at Annadel Farms to the lower pastures and to purchase hay and other feed for the cattle. The lack of water at Annadel Farms also impaired the amount of irrigation which could be done in the growing of field crops. Petitioner employed a geologist and water expert to prepare a report on the effect of the pumping of water from the two city wells on Annadel Farms' water supply. This report sets forth in detail the effect of the two city wells on the water supply in the area and the damage sustained to the Annadel Farms' water supply and the water supply of its neighbors. On May 25, 1956, petitioner's attorney wrote to the Board of Public Utilities of the city of Santa Rosa protesting the pumping of water from the two wells and on May 28, 1956, wrote letters to the owners of the two wells supplying *136 water to the city of Santa Rosa, advising them that petitioner would seek all legal remedies for past and future pumping of water. In 1956 petitioner and two of its neighbors filed a suit in the Superior Court of Sonoma, County of the State of California against the city of Santa Rosa and others to enjoin further pumping of water from the two wells and to recover monetary damages. An order denying the injunction was issued by the Superior Court and sustained on appeal to the District Court of Appeals of the State of California. In May 1961, petitioner and its two neighbors filed in the Sonoma County Superior Court a Complaint for Declaratory Relief Inverse Condemnation and Damages whereby petitioner seeks $475,000 for damages sustained as a result of depletion of its water supply. At the date of the trial of this case, this suit was still pending. During the period from November 10, 1955 through April 14, 1961, petitioner entered into written pasturage agreements with 12 different owners under which petitioner agreed to and did care for cattle at monthly rates per head ranging from $3 to $10. The total number of cattle which petitioner was caring for at one period in 1960 under *137 pasturage agreements was approximately 400. Petitioner never advertised in newspapers or otherwise that it was in the business of pasturing cattle. At all times material hereto petitioner maintained a number of horses at Annadel Farms including some thoroughbreds. Petitioner had on its payroll under the designation "horseman" during all the years here involved a full-time employee who was paid a salary of $250 to $300 a month plus the use of a house. The horses at Annadel Farms were used in connection with the pasturing and raising of cattle, for fence and fire patrols, and for inspecting timber on the farm. The only accessibility to the upper pastures where petitioner raised cattle is on horseback, and accessibility to some of the 45 miles of fences for inspection and repair was only on horseback. The horses at Annadel Farms were also used for pleasure riding. Prior to the acquisition of Annadel Farms by petitioner Coney and Gordenker Brothers of Glen Ellen, California entered into a lease arrangement whereby Gordenka Brothers paid $2.50 a ton for Sonoma stone and 75 cents a ton for wall rock with a minimum advance royalty of $300 a month for removal of stone from certain deposits *138 located on Annadel Farms. After petitioner acquired Annadel Farms it entered into a similar lease dated May 3, 1951, with Rodion and Allen Gordenker for removal of Sonoma stone and wall rock (sometimes referred to as rhyolite) for the same royalty payments. The royalty received by petitioner was net with the Gordenka brothers furnishing the plant and equipment and doing all of the mining and building of access roads at their own expense. On October 21, 1951, petitioner agreed to terminate the May 3, 1951 lease with the Gordenka brothers, effective in October 1951. On December 6, 1954, petitioner entered into a 5-year lease with Cliff Reed under which Reed was to operate one of the rhyolite quarries and to pay petitioner a royalty of $4 per ton for Sonoma cut stone, $3.50 per ton for flagstone, and $1 a ton for wall rock, with a minimum advance royalty of $300 per month. Reed was to furnish all machinery and equipment, do the mining and construct and maintain all access roads. The quarry covered in the December 6, 1954, agreement proved unsuccessful and in August 1955 petitioner suspended the minimum advance royalty requirement of $300 per month and granted Reed the right to open *139 and operate a new quarry area at Annadel Farms on the same terms as the lease of December 6, 1954. On June 18, 1956, the two leases between petitioner and Reed were terminated by consent of the parties and a new 3-year lease was entered into under which Reed was to operate one of the rhyolite quarries and to pay petitioner a royalty of $3.50 per ton of Sonoma cut stone, $3 per ton for flagstone, and $1 per ton for wall rock with a minimum monthly royalty of $250. The minimum royalty of $250 was suspended for the period November 1956 to February 1957, and about August 17, 1957, the parties terminated the lease because the operation did not prove profitable. There are a number of basalt rock quarries located within the confines of Annadel Farms. As early as 1870, a number of the basalt rock quarries were operated at Annadel Farms and most of the cobblestones used to pave San Francisco streets came from these quarries. In the process of making cobblestones, millions of tons of basalt chips were accumulated at the basalt quarries. By the early 1920's all basalt quarrying operations at Annadel Farms had ceased. In December 1952 petitioner's engineer made a survey of the various rock *140 quarries in the Santa Rosa area. This report discussed specifications and prices of base material for highway construction for the purpose of determining the feasibility of selling the Annadel Farms basalt rock for such use. In October 1952 petitioner purchased and had delivered to Annadel Farms a complete rock curshing plant, together with two No. 6 Allis-Chalmers gyratory crushers, elevators, trommels and belts. This plant and the equipment were used and were purchased by petitioner at a liquidation sale of the Cowell Portland Cement Company at a cost of $35,669.53, of which $25,892.18 was incurred in the fiscal year ended June 30, 1953, and the remaining $9,777.35 in the fiscal year ended June 30, 1954. This equipment was approximately 50 years old when petitioner acquired it. At the time this equipment was acquired, petitioner anticipated crushing and processing basalt chips. Petitioner believed that a portion of the rocks crushed in this plant would be suitable for use on the roads on Annadel Farms. After acquiring the rock crushing plant and equipment petitioner had a survey made of the rock business in the area, had cost studies made, and consulted various experts and interested *141 companies in the rock business as to the feasibility of producing crushed rock at Annadel Farms. The Annadel Farms' basalt rock was tested and given a Class A rating for use as base material and concrete aggregate by both the California and State of Washington Highway Commissions. After examining the rock crushing plant and machinery, engineers and experts advised petitioner that this plant and equipment were not the proper kind for use in the processing of basalt chips. Petitioner was also advised by experts that the plant and equipment were not suitable for crushing perlite. At the end of the year 1954 petitioner offered the plant and equipment for sale but had no bidders for it. Petitioner never assembled the rock crushing plant and at the date of the trial of this case it was still at Annadel Farms in an unassembled state. The entire cost of the rock crushing plant and equipment was capitalized by petitioner and depreciated upon the besis of a 10-year useful life. Petitioner claimed deductions for depreciation on the rock crushing plant and equipment in the amounts of $1,294.91, $3,078.09, and $3,566.95 during the taxable years ended June 30, 1953, 1954, and 1955, respectively. *142 On February 27, 1956, petitioner entered into a 10-year lease with Arthur B. Siri Company under the terms of which Siri was to erect its own rock crushing plant and remove crushed basalt rock from Annadel Farms for a royalty payment to petitioner of 5 cents per cubic yard for all stone removed and sold, with a minimum annual royalty of $500. After approximately 10 months petitioner's lease with Siri was terminated because the basalt chips proved to have too high a clay content for use as base material for highways. There were approximately 1,000 acres of timber at Annadel Farms including Douglas fir, eucalyptus, white oak, black oak, and redwood. In 1948 the California Division of Forestry made a survey of Annadel Farms timber and determined that some of the fir was suitable for use as lumber and that other of the fir and the encalyptus was suitable for cutting and use as fence posts and hoppoles. In the early part of 1954 petitioner employed the W. L. Cobb Timber Cruising Service to make a complete timber cruise at Annadel Farms. The Cobb report determined that there were a number of acres of commercially loggable timber at Annadel Farms and a large number of acres which could *143 be logged in conjunction with land clearing operations to make additional pasture land available. In March 1954 petitioner negotiated a cutting arrangement with Codding Homes of Santa Rosa, California, under which petitioner was to furnish a sawmill and Codding was to cut the timber on a selective basis and to pay petitioner $13 a thousand feet for all redwood and Douglas fir cut by them. Petitioner's timber was to be supplemented by Codding's bringing in outside timber and paying petitioner $2 per thousand board feet for use of the mill. These plans of petitioner and Codding were never carried out but were abandoned in 1955 when the Santz Rosa Planning Commission refused to issue the necessary permit for a sawmill operation at Annadel Farms because of possible contamination of the Santa Rosa water supply. Beginning in the summer of 1952 petitioner had certain of its employees prepare various studies and reports with respect to the feasibility of utilizing its timber as firewood and for making charcoal. Petitioner contacted various companies distributing charcoal in California to determine whether the demand for and marketing price of charcoal were such that it might anticipate *144 a profitable operation of a charcoal plant at Annadel Farms. Petitioner carried on negotiations with third parties who owned and operated charcoal kilns to try to work out an arrangement which might have the twofold advantage of utilizing certain of the timber at Annadel Farms in a profitable operation and also enabling the clearing of additional land for pasturage and other uses. A report was prepared in March 1955 estimating the cost and anticipated profit from a charcoal and charcoal briquette plant which might be erected at Annadel Farms. After considering the results of its investigation into possible arrangements for use of its timber for the making of charcoal, petitioner decided not to go ahead with this operation. Petitioner's president was of the opinion that to get into the charcoal business in a manner to make any large profit would require an investment of some $200,000 or $300,000 and that petitioner did not have the money to put into such a business. Petitioner concluded that every possible arrangement for making charcoal at Annadel Farms either would not be permitted or would not result in a profitable operation for petitioner. While petitioner was considering a charcoal *145 and briquette operation, it was also investigating the possibility of splitting wood at Annadel Farms for sale as firewood. In August 1954 petitioner obtained from the State of California Department of Natural Resources a permit to cut timber at Annadel Farms. One of the purposes stated for cutting of the timber was to clear land to increase the value thereof. In April 1955 petitioner entered into a contract with M. J. Mihalovich whereby Mihalovich agreed to cut 500 cords of wood at $8 a cord. About 500 cords of wood were cut and sold by petitioner as firewood during the summer of 1955. This 500 cords of wood was the only timber petitioner cut since it acquired Annadel Farms up to the date of this trial. In addition to the full-time employees who lived at Annadel harms in houses furnished by petitioner and who were designated as "hop foreman", "horseman" and "cattleman", petitioner also employed a fulltime salaried superintendent or ranch manager who lived on the ranch in a house furnished by petitioner. Prior to petitioner's acquisition of Annadel Farms, Coney had also employed a full-time and salaried superintendent. During the years here in issue, the superintendent of Annadel *146 Farms was Herbert Coney, the brother of petitioner's president. Up to March of 1954 the salary paid by petitioner to Herbertconey was $500 a month and beginning in March 1954 this salary was reduced to $475 a month. During the fiscal years ended June 30, 1953, 1954, and 1955, petitioner's labor expenses in connection with the operation of Annadel Farms were $46,005.61, $46,309.81, and $47,374.94, respectively. Most of the 75 miles of roads at Annadel Farms were constructed during the early 1940's when Coney owned the ranch. During its fiscal year ended June 30, 1953, petitioner expended $46,674 for repairs and improvements to the existing roads and for a concrete slab for a new machine shop. This entire expenditure was capitalized by petitioner. During its fiscal years ended June 30, 1951, through June 30, 1958, petitioner expended and capitalized on its books a total of $462,597.41 for improvements to land and buildings and for machinery and equipment used in connection with the Annadel Farms operation. The amount so expended in each of these fiscal years was as follows: Fiscal year
ended
June 30
Amount
1951
$ 74,760.72
1952
59,152.73
1953
108,145.06
1954
11,553.45
1955
8,060.00
1956
33,054.86
1957
140,579.70
1958
27,290.89
*147 The following schedule shows the gross receipts of petitioner from the operation of Annadel Farms during the years 1951 through 1961, showing the activity from which the amount was received: 1951
1952
1953
1954
Hops
$13,000.00
$6,782.81
$21,336.76
$14,425.13
Crop
1951
1951
1952
1953
Cattle
4,857.64
Pasturage
209.00
210.00
1,114.51
Horses
80.10
Wood
Quarries - Rhyolite, ba-
salt, field stone
900.00
1,059.38
Miscellaneous: Telephone Co. rt. of
way
Sale of hop picking
mach., hop poles &
wire
Sale of Mack dump
trucks (5)
House rent
Perlite Sand
P. G. & E. Payment for
easement
Sale of 3 Acres to Sonoma
Fld. Control
$13,900.00
$8,051.19
$21,546.76
$20,477.38
1955
1956
1957
1958
Hops
$ 5,535.00
$ 720.00
$ 950.00
Crop
1954
1954
1954
Cattle
827.93
7,165.87
$4,902.91
Pasturage
4,838.57
147.00
80.00
250.00
Horses
334.00
78.35
150.00
Wood
1,081.80
594.00
64.00
Quarries - Rhyolite, ba-
salt, field stone
549.62
2,029.81
1,843.40
862.71
Miscellaneous: Telephone Co. rt. of
way
3,956.80
Sale of hop picking
mach., hop poles &
wire
5,901.55
Sale of Mack dump
trucks (5)
750.00
House rent
Perlite Sand
P. G. & E. Payment for
easement
Sale of 3 Acres to Sonoma
Fld. Control
$11,257.19
$8,841.69
$16,684.82
$6,829.62
*148 1959
1960
1961
Hops
Crop
Cattle
$51,296.90
$18,112.08
Pasturage
160.00
5,313.13
$ 8,881.14
Horses
2,826.00
3,146.00
Wood
14.00
Quarries - Rhyolite, ba-
salt, field stone
160.50
166.50
322.50
Miscellaneous: Telephone Co. rt. of
way
Sale of hop picking
mach., hop poles &
wire
Sale of Mack dump
trucks (5)
House rent
308.00
Perlite Sand
7.50
P. G. & E. Payment for
easement
6,500.00
Sale of 3 Acres to Sonoma
Fld. Control
900.00
$51,946.90
$32,918.31
$13,249.64
Petitioner's books show the following amounts of income received and expenses incurred in the operation of Annadel Farms during its fiscal years 1952 through 1955: Fiscal year ended
Fiscal year ended
June 30, 1952
June 30, 1953
Expense
Income
Expense
Income
Hops
$33,721.72
$ 6,782.81
$30,107.25
$ 21,336.76
Alfalfa
492.85
592.50
Hay
1,150.51
1,205.91
Oats
324.32
1,710.68
Barley
28.00
8.24
Cattle
3,166.74
Horses
3,061.86
Beans
Miscellaneous income
1,268.38
210.00
Total income
$ 8,051.19
$ 21,546.76
Ranch maintenance and expense
Labor
15,245.17
18,783.29
Labor - Field upkeep
4,299.41
5,857.35
Supplies
2,276.10
2,675.36
Supplies - Field upkeep
10,043.81
5,373.40
Equipment - Field upkeep
1,004.45
2,683.31
Power
1,846.79
2,542.16
Auto, truck, tractor equipment
4,992.87
2,926.05
Insurance
1,866.98
1,823.13
Overhead
2,052.02
6,551.28
Entertaining
Clearing land - Pasture
2,538.00
Taxes
6,154.11
6,947.32
Perlite
1,172.53
574.50
Total expenses
$86,671.64
$99,528.33
Depreciation
$18,387.88
$105,059.52
$23,048.40
$122,576.73
Total expense per tax return
$ 97,008.33
$101,029.97
(net)
*149 Fiscal year ended
Fiscal year ended
June 30, 1954
June 30, 1955
Expense
Income
Expense
Income
Hops
$28,706.90
$ 14,425.13
$12,959.94
$ 5,535.00
Alfalfa
52.13
1,032.63
Hay
4,347.13
1,584.07
Oats
882.65
570.57
Barley
399.55
355.44
Cattle
3,683.48
4,677.64
7,680.04
Horses
7,732.70
7,396.82
Beans
432.74
1,963.14
Miscellaneous income
967.51
4,609.57
Total income
$ 20,070.28
$ 10,144.57
Ranch maintenance and expense
Labor
11,225.49
22,750.86
Labor - Field upkeep
3,856.04
1,596.24
Supplies
3,545.39
1,813.56
Supplies - Field upkeep
275.98
810.84
Equipment - Field upkeep
1,949.98
5,366.22
Power
2,579.26
2,203.74
Auto, truck, tractor equipment
2,986.85
3,055.68
Insurance
2,511.21
2,383.39
Overhead
5,659.44
3,173.10
Entertaining
906.99
445.59
Clearing land - Pasture
3,273.46
Taxes
8,544.46
8,902.58
Perlite
496.84
3,332.06
Total expenses
$90,775.21
$92,649.97
Depreciation
$26,958.79
$117,733.91
$27,484.02
$120,133.99
Total expense per tax return
$ 97,663.63
$109,989.42
(net)
$109,210.80
778.62
$109,989.42
*150 All of the amounts as shown on petitioner's books were actually expended by petitioner for the purpose described. In May 1962 petitioner sold 604 of the 6,000 acres of Annadel Farms to an unrelated third party for a little over $1,000,000 and realized a gain from this sale of approximately $375,000. During the years here involved Coney was required to be away from San Francisco a great deal of the time and the operation of Annadel Farms was handled primarily by the superintendent and other hired employees. During the taxable years here in issue Coney did not visit Annadel Farms more than ten times during any one year. When Coney visited Annadel Farms, he stayed at one of the houses on the ranch known as the "main house." On each of Coney's visits to Annadel Farms he transacted business in connection with petitioner's operations. On some of these visits he was accompanied by his family and in some instances, personal friends would visit him at Annadel Farms when he was there. In addition to his personal residence located in Berkeley, California Coney owned a large summer home located on a lake in Pinecrest approximately 300 miles from Annadel Farms. Coney and his family generally *151 spent their vacation at this summer home and customarily entertained their personal friends either at their home in Berkeley or their summer home at Pinecrest. When visiting Annadel Farms, Coney would use the horses there for pleasure riding. The main house at Annadel Farms was a 1-story frame farmhouse, nicely but modestly furnished. During its fiscal years 1952 and 1953 petitioner constructed at Annadel Farms a swimming pool, a bath house, and a barbecue and patio area near the main house. The area covered by the main house, swimming pool, bath house and barbecue and patio was approximately 2 1/2 acres. The pool cost $13,895.99, the bath house cost $7,269.11, and the barbecue and patio area cost $3,135.50, making a total of $24,300.60. During the period from February 10, 1951, to June 30, 1951, petitioner spent $11,335.11 in improving the main house at Annadel Farms. Petitioner on its books capitalized these expenditures. Beginning about 1949 when Annadel Farms was owned by Coney petitioner held an annual party there for the purpose of entertaining various representatives of major oil companies and shipping interests and representatives of shipyards and other persons with whom *152 petitioner did business. Representatives of the United States Coast Guard and United States Navy were also present at these parties. There would also be included among the guests at these annual parties a few personal friends of Coney. These annual parties lasted for 3 days and came to be known as the Admirals' Party. The parties were usually held following the annual meeting of the Pacific American Tankship Association or the annual meeting of the American Petroleum Institute. Coney was president and one of the founders of the Pacific American Tankship Association. The Admirals' Party was very popular and was attended by as many as 65 or 75 people, most of whom were persons connected with or interested in the shipping industry. Petitioner did not do any advertising in connection with its shipping business. Its tanker business was obtained primarily through personal contacts and acquaintances of petitioner's executives and executives of oil companies and other persons connected with the tanker business. For the first few years in which the Admirals' Party was held the Pacific American Tankship Association acted as co-host with petitioner and shared the expenses of the party, but *153 during the later years all expenses of the annual party were paid by petitioner. In order to provide better facilities for the Admirals' Party petitioner during its fiscal year 1953 converted part of an old barn into a dormitory. The remaining portion of the barn was used as a storage place for farm tools. The portion of the barn converted into a dormitory was used solely to house guests attending the Admirals' Party and was closed at all other times during the year. The barbecue had arrangements for two different kinds of barbecue and the large barbecue pit was suitable only for use at a very large party such as the Admirals' Party. On certain occasions other than at the time of the Admirals' Party petitioner entertained guests at Annadel Farms. Except for the expenses of the Admirals' Party, all costs for food and liquor in connection with entertaining both business and nonbusiness guests at Annadel Farms were paid for personally by Coney. During the years here involved petitioner's employees visited Annadel Farms and they were permitted to and did use the main house and swimming pool and to ride the horses. Coney also at times permitted personal friends of his to use the main *154 house, swimming pool, and other facilities of Annadel Farms when he was not there personally. During petitioner's fiscal years ended June 30, 1953, 1954, and 1955, the direct expenses incurred by petitioner in connection with the main house, swimming pool, barbecue pit, and patio for such items as electricity, telephone, maintenance and repairs, laundry and cleaning totaled $2,586.10, $2,565.88, and $2,389.66, respectively, and depreciation on these facilities was $2,015.87, $2,460.03, and $2,460.03, respectively. There is no segregation on petitioner's books of the portion of the general ranch expenses attributable to the main house and related facilities. During the period from 1931 through 1951 when Coney personally owned Annadel Farms, he operated it at about a break-even point without profit or loss for most years. For the taxable year 1950 Coney reported on his personal income tax return a loss from the operation of Annadel Farms in the amount of $14,942.41. This amount resulted from total income from Annadel Farms of $76,312.79 and total cost of operation of $91,255.20. For the fiscal years ended June 30, 1953, 1954, and 1955, petitioner claimed farm losses from the operation *155 of Annadel Farms in the amounts of $101,029.97, $97,516.63, and $109,210.80, respectively. Respondent in his notice of deficiency made no adjustments to petitioner's income as reported for the fiscal year ended June 30, 1952, but determined a deficiency because of a previously allowed tentative carryback loss from the year 1954. For the year 1953 respondent disallowed the claimed farm loss of $101,029.97 which amount consisted of depreciation claimed on the rock crushing equipment in the amount of $3,569.59 and other farm losses of $97,460.38; and for the year 1954 respondent disallowed the claimed farm loss of $97,516.63 which was composed of disallowed depreciation claimed on the rock crushing equipment of $3,569.59 and other farm loss of $93,947.04. For the year 1953 respondent also eliminated the previously allowed tentative carryback adjustment from the fiscal year 1955. Respondent explained his disallowance of the depreciation deduction on the rock crushing equipment in each year on the basis that the plant was not in use and his disallowance of the remaining farm loss in each year on the basis of failure to substantiate the deduction as constituting ordinary and necessary *156 business expenses and also for lack of a business purpose and as constituting a personal hobby of petitioner's president and sole stockholder. The year 1955 is in issue here solely because of the carryback adjustment. Petitioner in its petition as amended claimed deductions in the amount of $1,197.17 on breeding cattle for its fiscal year ended June 30, 1954, and in addition to alleging error with respect to the disallowance of its claimed net operating loss deduction carryback from the fiscal year 1955 to the fiscal year 1953, claimed that the amount of such net operating loss carryback should be increased by allowance of a deduction in the amount of $1,415 as depreciation on its breeding cattle and a loss of $35,669.53 on abandonment of its rock crushing equipment. Opinion It is petitioner's position that during all of the years here involved it was operating Annadel Farms as a business for the purpose of making a profit, and that all of the amounts expended by it in the operation of Annadel Farms including the expenditures in connection with the ranchhouse and related facilities are deductible by it as business expenses or the net loss is deductible as a farm loss. Respondent *157 contends that petitioner's expenses in operating Annadel Farms are not ordinary and necessary business expenses to the extent that they exceed its income from the farm since its purchase of Annadel Farms was for the purpose of providing Coney with the funds to buy out petitioner's other remaining shareholder, at the time of purchase petitioner should have been aware that it could not place Annadel Farms on a money-making basis, and petitioner did not operate Annadel Farms during the years in issue as a business with an intent to make a profit. Respondent in the alternative contends that if petitioner did conduct some business activities at Annadel Farms during the years in issue, the portions of the expenses which are related to its activities in connection with its mineral and timber represent nondeductible capital expenditures, and that a portion of the expenses was for the personal benefit of Coney. Respondent takes the position that the burden is upon petitioner to allocate the expenses of Annadel Farms between the deductible and nondeductible portions and that petitioner's failure to meet this burden should result in all of the expenses being disallowed. Although there is no *158 direct evidence in the record as to the reason why petitioner acquired Annadel Farms as distinguished from the reason why Coney sold Annadel Farms, we think the inference is clear that petitioner acquired Annadel Farms because Coney wished to obtain the cash with which to buy petitioner's remaining stock by a sale of Annadel Farms to an entity which he owned. However, the price at which Coney sold Annadel Farms to petitioner was not excessive and from the evidence in the record appears to be substantially below the fair market value of Annadel Farms at the date of sale. While the reason for petitioner's acquisition of Annadel Farms is a relevant factor in determining whether the farm was operated by petitioner as a business, it is not a determinative factor. Respondent does not question the bona fides of the sale. The evidence shows that Coney did make a bona fide sale of the farm to petitioner. The evidence shows that petitioner could not reasonably anticipate during any one year here involved making a profit from the operation of Annadel Farms but negates respondent's contention that petitioner should have known at the time it purchased Annadel Farms that it could not place Annadel *159 Farms on a profitable basis. The evidence shows that the various aspects of operations investigated by and started by petitioner were in an attempt to arrive at an operation which would produce a profit. Whether the activities conducted at Annadel Farms amounted to carrying on a trade or business within the statute is largely a matter of degree to be determined from the facts of the case. International Trading Co. v. Commissioner, 275 F. 2d 578 (C.A. 7, 1960), affirming a Memorandum Opinion of this Court. In that case the Court stated that for a taxpayer's activities to constitute carrying on a trade or business he need not have a reasonable expectation of profit but must initiate or conduct the enterprise in good faith with an intention of making a profit or of producing income. If the activity is for the personal benefit of petitioner's stockholders and not one from which petitioner had an intention to earn a profit, it cannot be considered as a trade or business. American Properties, Inc., 28 T.C. 1100 (1957), affirmed per curiam 262 F. 2d 150 *160 (C.A. 9, 1958). In that case we stated at p. 1114: * * * There have been a number of cases, some of which are referred to hereinabove, involving activities which partook to some extent of the nature of hobbies (such as farming, horseracing, horsebreeding, dog raising, etc.) which were held to constitute businesses justifying the deduction of losses for tax purposes. However, such cases are distinguishable in that in each the taxpayer had definitely embarked upon business activities with intent to make a profit. In none of them did the taxpayer merely have in mind the thought of possibly engaging in business activity for profit at some future time, as is true in the instant case. In the instant case petitioner's president in his testimony stated a number of times with respect to the various activities in connection with Annadel Farms that they were entered into with the intention of making a profit and that Annadel Farms was a business operation. The evidence of what was in fact done is more persuasive than the statements in the nature of opinion or conclusions by an interested witness. In the instant case we are convinced from the various reports, correspondence, and other documents *161 which are in evidence, as well as the testimony of the witnesses including Herbert Coney, the superintendent of Annadel Farms who was called as a witness by respondent, that the operation of Annadel Farms by petitioner including the raising of hops, the pasturing of cattle, the purchasing of cattle and developing a herd, as well as the leasing of the stone quarries and the cutting of timber, were done in an effort to make a profit and for a business purpose. We believe that these operations all constituted a part of the operations of Annadel Farms and not an effort to enter separate businesses and that the expenses in connection with these operations, even though the operations resulted in net losses in each of the years here involved, are properly deductible by petitioner. Even if we view the various mineral and timber operations as not being a part of the operation of Annade Farms, we do not agree with respondent that on the basis of this record expenses during the years here involved in connection with these operations were prebusiness expenses of a capital nature. Petitioner in these years made leases and contracts in an effort to obtain a profit from the mineral operation and *162 from its timber and had gross receipts therefrom. Each of these enterprises proved unprofitable for various reasons but from the facts here we conclude that each was engaged in as a business undertaken with the intent to make a profit during the taxable years here in issue. The fact that the businesses of leasing the quarries and cutting the timber were actually engaged in during the years here involved distinguishes this case from Radio Station WBIR, Inc., 31 T.C. 803 (1959), relied on by respondent. In that case we held that expenses incurred by a radio station in acquiring a television license were not paid or incurred in a business presently engaged in by the taxpayer and therefore were not deductible. The instant case is also distinguishable on its facts from Mid-State Products Co., 21 T.C. 696 (1954) where the taxpayer on its records had capitalized expenditures incurred in preparing to enter a new business. The only activity which petitioner conducted that might be viewed as investigating the entrauce into a new businnss was in connection with the possibility of manufacturing charcoal and charcoal briquettes. Even this investigation had the twofold *163 purpose of a profitable operation in charcoal manufacture and the clearing of additional pasture land for use in the grazing of cattle, a business currently being conducted by petitioner when the investigation was made. The investigation into the possibility of charcoal manufacture was done by petitioner's employees and although the expense applicable to this investigation is not shown by the record, it is clear from the nature of the investigation that its cost would be nominal. Furthermore, the idea of entering the business of manufacturing charcoal was abandoned by petitioner during the year 1955. Petitioner points out that if any expenses were incurred in the period 1952 through March of 1955 in this investigation which should have been capitalized, such amount would be deductible in 1955 when the project was abandoned. We conclude that any expenses in the investigation of a charcoal business were so minimal that no adjustment is required even though technically such expenses are capital expenditures. The evidence here clearly shows that the operations of Annadel Farms including the mineral leases and timber contract were in no way a hobby of Coney. In fact with the exception *164 of the ranchhouse and saddle horses hereinafter discussed, respondent does not specifically contend that the operations of Annadel Farms were a hobby of Coney. Respondent's position is that petitioner could not reasonably anticipate the making of a profit and that therefore it was not engaged in a business. Respondent makes no distinction between the reasonable anticipation of a profit and the intention to make a profit. The activities here were all undertaken in an effort and with an intention to make a profit. There is no question that petitioner here had a valuable property and it is clear that with the improvements petitioner was making thereon, the value of this property was increasing while petitioner was holding it. Cf. Israel O. Blake, 38 B.T.A. 1457, 1460. From the evidence as a whole we conclude that petitioner's farming, cattle, mineral and timber operations at Annadel Farms were undertaken with the intent to make a profit even though during the years here involved the operations, resulted in losses. Cf. Dean Babbit, 23 T.C. 850, 868 (1955). The record is not equally clear as to the nature of the expenditures in connection with the ranchhouse *165 and its surrounding recreational facilities. Certainly, these facilities were not used in a siguificant amount personally by Coney, his family, and friends who were not business acquaintances as distinguished from being used by petitioner's employees and for the entertainment of persons connected with firms with whom petitioner did business. However, the record is not at all clear as to the business necessity or business advantage to petitioner from the entertaining done at Annadel Farms. The fact that persons connected with petitioner's business and its employees used the ranchhouse and recreational facilities does not necessarily mean that there was a business purpose in such use. The fact that an individual is an employee or business associate does not prove that any entertainment in which he is included is for a business purpose. There is little evidence in this record tending to show a proximate relationship between the use of the ranchhouse and related facilities and petitioner's business. Although the evidence shows that Coney stayed at the ranchhouse when he was at Annadel Farms on petitioner's business there is no showing of the necessity for keeping the ranchhouse for this *166 purpose. Petitioner's house in Berkeley was only 55 miles from Annadel Farms and the city of Santa Rosa was only 7 1/2 miles away. There has been no showing that there was any business purpose for petitioner's family going to the ranchhouse and the record does not show which employees of petitioner's used the ranchhouse or how their use of the ranchhouse was any benefit to petitioner. Other than the guests at the Admirals' Party, there is no showing who were the so-called business guests entertained at the ranchhouse or how their entertainment aided petitioner's business. It also appears that even the Admirals' Party may have been more a personal interest of Coney because of his interest in the Pacific American Tankship Association, of which he was president and one of the founders, than a business interest of petitioner. Certainly the evidence is meager as to the benefits petitioner derived from the entertaining done at the Admirals' Party. Coney in his testimony stated that the Admirals' Party was held for the purpose of engendering goodwill for petitioner among representatives of the oil and shipping industry. However, there is no showing of the way in which the goodwill engendered *167 by this party had a direct relationship to petitioner's business. The record shows that most of petitioner's charters were obtained through personal contact but how high ranking Coast Guard and Navy officers would constitute personal contacts for the obtaining of such charters is not shown. In fact, it is not clear how petitioner's business was furthered by the representatives of the various business firms to whom petitioner chartered tankers or attempted to charter tankers who were entertained at the Admirals' Party. It may be that some portion of this expense was a justifiable business expense deduction, but respondent has apparently not disallowed the deduction for the expenses of this party except as some of them might be included in the deductions for ranch maintenance and expense taken by petitioner. It will be noted from the facts we have set forth that no deduction for entertainment is shown in these expenses for the fiscal years ended June 30, 1952 and 1953, and that for the fiscal years ended June 30, 1954 and 1955, the amount of such deductions is only $969.99 and $469, respectively which is not shown in any manner to represent the expenses of the Admirals' Party. What portion *168 of petitioner's expenditures in connection with the ranchhouse with its swimming pool and barbecue might constitute deductible business expenses of petitioner is difficult to determine from the record. Certainly some business use was made of it and not all the expenses should be disallowed. However, it is equally clear that the direct expenses for electricity, telephone, maintenance and repairs, and laundry and cleaning of the ranchhouse and the swimming pool, and the depreciation on these facilities did not constitute the total cost of their maintenance. As respondent points out, a portion of the general overhead of operating Annadel Farms would also be properly applicable to the ranchhouse. The record also shows that the horses maintained on the ranch were ridden for pleasure by Coney and his guests at the ranchhouse. Petitioner argues that this use of the horses was inconsequential but the record affords no basis for an exact comparison of the amount of time the horses were used for pleasure riding and for work on the ranch. Exercising our best judgment from all the facts in the record we conclude that the portion of the general ranch expenses properly allocable to maintaining *169 the ranchhouse and its related facilities and the horses for pleasure riding would not exceed the amount of the cost in connection therewith properly deductible as a business expense. We sustain respondent in his disallowance of petitioner's claimed deduction of expenses of maintenance of the ranchhouse and related facilities at Annadel Farms to the extent of the amounts of $4,601.97, $5,025.91, and $4,849.69 for the fiscal years ended June 30, 1953, 1954, and 1955, respectively. In using the amounts of the direct expenses of the ranchhouse and related facilities and depreciation thereon as the measure of the nondeductible portion of the expenses of maintaining the ranchhouse and related recreational facilities, we are not unaware that some business use was made of these facilities. Since there is no exact basis for apportioning the business and nonbusiness portion of these expenses any more than the portion of ranch overhead that should be disallowed, we have used these figures as representing our best judgment of the total expenses attributable to the nonbusiness uses of the ranchhouse and related facilities. Cf. Challenge Manufacturing Co., 37 T.C. 650 (1962). *170 Respondent disallowed petitioner's claimed depreciation deductions with respect to the rock crushing plant on the basis that this plant was never used by petitioner in its operations. Depreciation on an asset normally begins at the time such asset is placed in service in a taxpayer's business. St. Louis Malleable Casting Co., 9 B.T.A. 110, 119-120 (1927). Respondent's regulations specifically provide that the period for depreciation of an asset shall begin when the asset is placed in service. (A)-10 (A)-10 (A)-10 Section 1.167 (a)-10(b), Income Tax Regs, issued under the 1954 Code. Cf. Nulex, Inc., 30 T.C. 769 (1958). We agree with respondent that since the rock crushing plant was never actually placed in operation, petitioner is not entitled to the claimed deductions for depreciation thereon. In its reply brief, petitioner in effect concedes that respondent is correct in his disallowance of its claimed depreciation deductions on the rock crushing equipment but contends that its claimed abandonment loss in 1955 should then be the full amount *171 of the cost to it of the rock crushing equipment. We sustain respondent in the disallowance of the depreciation claimed by petitioner on the rock crushing equipment. We also agree with respondent that petitioner has failed to establish that it sustained any loss from the abandonment of the rock crushing equipment in 1955. All that the evidence shows is that at the end of 1954 petitioner put the equipment up for sale but had no buyers. There is no evidence to show what efforts petitioner made to sell the equipment or what occurred in 1955 as distinguished from the end of 1954 when the equipment was first offered for sale to cause it to be abandoned, or in fact that there was any change in attitude of petitioner towards this equipment during the year 1955 from that which had existed prior thereto. The record does not show that petitioner ever wrote the equipment off on its books. Petitioner, having offered the plant and equipment for sale at the end of 1954, merely left the equipment in 1955 lying at the place where it had been put when it was brought to Annadel Farms. There is no showing that any real effort to sell it was made, or that there was no market for the equipment. Cf. *172 California Iron Yards Co., 15 B.T.A. 25, 37-38 (1929). Mere nonuse of property does not constitute abandonment. I. G. Zumwalt, 25 B.T.A. 566 (1932). There has been no showing that the equipment was not in the same condition in 1955 as when petitioner bought it. There is no showing that in 1955 the equipment was not in condition for use for the purpose for which it was designed. For these reasons the case is distinguishable from B. Manischewitz Co., 10 T.C. 1139 (1948), relied upon by petitioner. We hold that petitioner is not entitled to an abandonment loss in 1955 for the cost to it of the rock crushing equipment. The final issue involves petitioner's claimed deduction for depreciation with respect to its cattle. Respondent's primary position in this respect is that petitioner is not entitled to a deduction since it has failed to show that the cattle were used in any trade or business in 1954 or 1955 or held for the production of income in those years. In view of our holding that petitioner's operations of Annadel Farms constituted a trade or business, *173 we hold that the cattle were used in petitioner's trade or business. Respondent further argues that petitioner is not entitled to the depreciation deduction because petitioner has failed to establish a salvage value for the cattle. In this connection respondent relies on Koelling v. United States, 171 F.Supp. 214 (D.C.Neb., 1957). The instant case is distinguishable from Koelling v. United States, supra.In the instant case the amount of depreciation with respect to the cattle was agreed to by the parties and presumably in reaching this agreement salvage value was considered. In this connection respondent's counsel stated that if the Court determined that "depreciation in whole or in part is allowable on the cattle, then the figures appearing on the Schedule 290 can be used in that determination." The depreciation shown on the schedule referred to by respondent's counsel is an exhibit in evidence and shows depreciation on the cattle in the amounts of $1,197.17 and $1,415 for the fiscal years ended June 30, 1954 and 1955, respectively. We sustain petitioner in its contention that it is entitled to a deduction for depreciation on its cattle in these amounts *174 for these years. Decision will be entered under Rule 50. Footnotes
1. Season average price received by farmers.↩